962 A.2d 404

**TRINITY ASSEMBLY OF GOD OF BALTIMORE CITY, INC.**

v.

**PEOPLE'S COUNSEL FOR BALTIMORE COUNTY, et al.**

No. 27 Sept.Term, 2008.

Court of Appeals of Maryland.

Dec. 24, 2008.

C. William Clark (Nolan, Plumhoff & Williams, Chtd., Towson, MD), on brief, for Petitioner.

Peter Max Zimmerman, People's Counsel for Baltimore County (Carole S. Demilio, Deputy People's Counsel, Towson, MD), on brief, for Respondents.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY and JOHN C. ELDRIDGE (Retired, Specially Assigned) and IRMA S. RAKER, (Retired, Specially Assigned), JJ.

HARRELL, Judge.

This litigation arises from the denial of a church's request for variances from Section 450 of the Baltimore County Zoning Regulations (the "Zoning Code" or "BCZR"), which limit the area and height of an identification sign to 25 square feet and six feet, respectively. Section 450 allows an institution, including a church, to have one identification sign,[1] within these limits, for each frontage of its property.[2] If multiple such signs are allowed, one may contain changeable copy capabilities.[3] The Zoning Code also permits the County Board of Appeals (the "Board"), in limited circumstances, to grant variances from the strict application of the standards of Section 450 where an applicant demonstrates that its property has unique physical characteristics that cause the area and height limitations to affect disproportionately the property and that compliance with those limitations would impose a practical difficulty for the applicant. In the present case, the church wishes to erect and maintain a new sign facing the Baltimore Beltway. The proposed sign would be 250 square feet in face area and 25 feet high, with a significant portion of the sign face devoted to electronic changeable copy. The Board denied the necessary variances. The church now challenges the Board's application of the requirements for the grant of a variance. The church further claims that denial of

---

**1.** An "identification sign" is "a sign displaying the name or purpose of a place or structure." BCZR § 450.4

**2.** Section 450 defines "frontage" as "[a] lot line of a premises which is co-terminous with a right-of-way line of a highway to which the premises has or would be allowed pedestrian or vehicular access." BCZR § 450.3

**3.** Section 450 defines "changeable copy" as "meaning an on-premises sign displaying a message which may be changed periodically, manually or by electric or electronic controls." BCZR § 450.4.

the variances here violates the Religious Land Use and Institutionalized Persons Act (the "RLUIPA"), a Federal statute that prohibits a zoning authority from imposing a substantial burden on an institution's religious exercise, unless that burden is the least restrictive means of advancing a compelling government interest. 42 U.S.C.A. §§ 2000cc *et seq.* (2003). For reasons we shall explain, we shall affirm the Board's decision to deny the requested variances, as well as its conclusion that that denial does not violate the RLUIPA.

## Facts

Trinity Assembly of God of Baltimore City, Inc. ("Trinity") operates a church from facilities located in a low-density residential zone in the greater Towson area of Baltimore County. Trinity has between 1700 and 2000 members, with approximately 1300 of them attending church services in any given week. The congregants come from the greater Baltimore area and as far away as southern Pennsylvania. Trinity's property ("the Property") consists of approximately 15 acres of land located at the intersection of West Joppa Road and the Baltimore Beltway ("the Beltway" or "I–695"). The north side of the Property abuts the Beltway's eastbound lanes. Sole vehicular and pedestrian access to the Property is provided by an entrance on the West Joppa Road frontage of the Property. Trinity has four buildings on the Property: a 2400–seat sanctuary that can be seen from the Beltway; an older sanctuary that is connected to the current sanctuary by a walkway; an educational/office building; and a fellowship hall. These structures make up approximately one-third of the Property. The Zoning Code permits churches in the zone in which the Property is placed.

Trinity has two existing identification signs on the Property. One is 36 square feet and is located at the Property's West Joppa Road entrance. Trinity received a variance for that sign in 1982, allowing it to be 36 square feet in face area. Trinity's other sign, which is 24 square feet in face area, is situated where the Property abuts the Beltway and is parallel

to the Beltway, such that, theoretically, it is viewable by both eastbound and westbound motorists.

The driving force of the present litigation, which began more than six years ago, is Trinity's desire to replace the current Beltway-facing sign, which simply identifies the church as "Trinity Assembly of God," with a new, single-faced sign that would be 250 square feet in area, 25 feet tall, and face eastbound traffic only. A portion of the face area of the proposed sign, approximately five feet long and 18½ feet wide, would be changeable copy operated electronically by Trinity. Trinity seeks variances from the square-footage and height limitations, codified in Section 450 of the Zoning Code ("Section 450" or "the Sign Law"), which, we reiterate, are 25 square feet and six feet, respectively.[4]

On 9 September 2002, Trinity filed a Petition for Variance with Baltimore County. The People's [Zoning] Counsel for Baltimore County opposed the petition. In a written memorandum and order, the Deputy Zoning Commissioner denied Trinity's petition, concluding:

---

4. As noted earlier, the Sign Law permits one identification sign for each frontage of a property. BCZR § 450.4. In the present case, because the Property is not accessible directly from the Beltway, it is not clear how the Property's border with the Beltway constitutes "frontage," as that term is used in Section 450. As noted *supra* in note 2, "frontage" is "[a] lot line of a premises which is co-terminous with a right-of-way line of a highway to which the premises *has or would be allowed pedestrian or vehicular access.*" BCZR § 450.3 (italics added). The record before us reveals that People's Counsel argued to the Board that Trinity's current Beltway-facing sign is non-conforming, but the record does not make patent the basis for that argument. In its 2 July 2004 opinion and order, the Board resolved that the issue of the propriety of a Beltway-facing sign for Trinity "is for another day and another time"; however, in its decision, the Board later noted, perhaps offhandedly, that Trinity "is permitted as a matter of right" to have an identification sign on the Property's border with the Beltway. The only zoning issue squarely before the Board here, however, was whether unique circumstances and practical difficulty justified variances from the Sign Law's area and height limitations. Thus, we shall assume, without deciding, that the Sign Law permits Trinity to erect a sign on the Property's border with the Beltway, as long as it is consistent with the designated area and height limitations or Trinity receives variances from those limitations.

After considering the testimony and evidence offered both in support and opposition to [Trinity's] request, I find that the variance request to permit the sign in question to be constructed on [Trinity's] property should be denied. Of particular concern to me was the flashing message portion of the sign in question. The testimony offered at the hearing did demonstrate that the old sign is out-dated and is in need of replacement. However, the sign proposed to replace the old sign is not appropriate and cannot be approved.

Trinity appealed to the Board, contending that the grant of the variances is required because the Property is unique and that strict compliance with the Sign Law would result in practical difficulty for Trinity. The Board held a *de novo* evidentiary hearing, on three nonconsecutive days between 17 July 2003 and 10 December 2003.

Trinity's first witness was George Raduano, its pastor. Pastor Raduano explained why he felt that Trinity needed to replace its current Beltway-facing sign:

Q. Now why is the church asking for a new sign on the north side of the property which faces the I–695 Beltway?
A. Well, a few reasons. One is identification of the church. We are usually known as the church with the big roof, but no one knows our name.

We'd like to make our name prominent, since it cannot be read from the road sign. Also for directional purposes. We have had a great number of people who have explained they have had difficulty driving one Sunday, two Sunday[s], three Sundays, before they found us, because the interchange is complicated there.

So on the sign, we want the exit number with directions that they could read during the week when they choose to worship with us so they can find us a little more readily.....

... We have situations where people have invited people to church and have waited, and told me later their friend could not find the church because of how difficult it was.

So we try to, on the back of business cards, on our map, on our web page, have directions everywhere we can. I guess [the proposed sign] would be another way to help us clarify the directions.

Q. Are there other reasons why the church wants to have a new sign in addition to identifying the location?

A. Well, we would like also to be able to use it so people know of upcoming events or service times or to use it for some public service, time, temperature or a Red Cross Blood Drive, anything like that, or maybe to put a scripture verse of encouragement, any of those areas.

Q. Do you believe that that is an integral part of your functioning as a church to be able to do that?

A. Yes, I do.

Pastor Raduano complained that visibility of Trinity's sanctuary from the Beltway is compromised by a concrete sound barrier, approximately 20 to 25 feet high, running along the Beltway. Moreover, he expressed his belief that travelers on the Beltway have difficulty seeing the current Beltway-facing identification sign because of the physical characteristics of where the Property abuts the Beltway. Pastor Raduano stated that the State Highway Administration placed evergreen trees of varying heights and a six foot high chain link fence on a berm that sits one to two feet higher than the edge of the Property. These obstacles, contributed to by the Property's physical attributes, are compounded by the complicated nature of the I–695/I–83 interchange, which confuses Beltway travelers as they drive past the Property.

Although Trinity's web-site posts travel directions to the church, Pastor Raduano contemplated that the proposed larger sign would be helpful in that regard because the directions are difficult for some people to follow. He explained that parishioners and visitors complain regularly to him that Trinity is hard to find; however, when pressed on cross-examination, he could not quantify, even approximately, how many people had such difficulty. Nor did he know approximately how many people, if any, consulted Trinity's web-site or a map

to divine directions. Furthermore, Pastor Raduano admitted on cross-examination that the proposed sign would have limited directional value. Recovering from this admission, however, Pastor Raduano suggested that the sign would let people know where the church is located so that they could come back for church services or other events at a later time. He expressly acknowledged that, besides identification, the sign would serve a non-commercial advertising purpose. He stated that the sign would "let people know where we are and who we are."

Trinity's next witness, Ellis Shapos, was accepted by the Board as an expert regarding "media signage." Shapos stated that he is employed by, and part owner of, Visual Message and Displays, Inc., which provides "consulting services [and] marketing" and supplies "electronic media message displays and wireless communication displays." He has been in the sign industry since 1996.

Shapos testified that Trinity approached him in December 2000 to assist with the design of a sign with electronic messages. Specifically, he stated:

I was asked to perform a site survey and do an evaluation by traffic counts, visual inspection, and I took it upon myself, with the Pastor Raduano and the church members, on what they wanted to accomplish as far as my finding, as far as promotion, as far as providing public service in the design element.

He explained his methodology for carrying out these responsibilities:

I physically went past the [sic] site, but did visual analysis photographs, conferred with [the] State Highway [Administration], did traffic counts, speed analysis, to determine approximate speed. Referred to the Federal Highway Administration, their study, as far as recommended character height, and tried to abide by their rules and regulation in the design process.

Shapos claimed to have relied on the industry standard Manual of Uniform Traffic Control Devices (the "MUTCD") to

determine how large the electronic characters on the proposed sign would need to be in order for the sign not to pose a safety problem for motorists straining to see it. Based on his assessment of the MUTCD, and considering that Trinity also wanted the proposed sign to have on it the church's logo and directions, "Exit 23B, right Joppa Road," Shapos opined that the proposed sign must be 25 feet high and that the sign's changeable copy portion must be approximately 84 square feet. Shapos also testified that the electronic characters should be at least 17 inches tall, with a minimum of 15 characters per line, and that the sign should not have more than two lines of electronic messaging.[5]

Robert Claus, Ph.D., also testified on Trinity's behalf. The Board accepted his credentials to testify as an expert in signs and the sign industry. The Board concluded that Dr. Claus has an extensive education in economics and a familiarity with the State and Federal agencies that regulate signs and commercial communications. Dr. Claus maintained that the MUTCD establishes a national "standard of care" with respect to the "readability, con[spi]cuity or size, height, placement and illumination" of signs. It was Dr. Claus's opinion that "[e]very state must either adopt [the MUTCD] as Oregon has, or de facto create their own manual around the MUTCD." Relying on his view of the MUTCD, Dr. Claus stated that the Sign Law conflicts with the appropriate standards for the readability and conspicuity of signs and that the sign proposed by Trinity would not be a safety hazard. He also testified that the proposed sign would be beneficial to Trinity because it would "allow them to use their property as zoned." As for the surrounding community, Dr. Claus believed, based on his

---

5. Later, in Trinity's rebuttal case, Shapos testified that, although the variance petition proposed a 250 square-foot sign, the sign actually would be somewhat smaller. Trinity's counsel proffered that it would be approximately 160.82 square feet, but that Trinity requested 250 square feet in its petition because the County's Zoning Review Department mis-informed Trinity how signs are to be measured under the Sign Law. Trinity does not argue in this Court that the Board erred in finding that the proposed sign would be 250 square feet in face area.

studies, that the proposed sign would not have a negative impact.

On cross-examination, Dr. Claus disclosed that he is Executive Director of the Sign Foundation for Communication Excellence, a nonprofit educational group committed to "protect[ing] commercial and non-commercial speech." He agreed that promoting signs goes "hand in hand" with protecting speech. He acknowledged also that he is a consultant for the International Sign Association, "the largest trade association in the sign industry." He spent no more than five hours preparing for his testimony in this case and did not review the Baltimore County Master Plan in connection with that preparation.

William Monk was the next Trinity witness to testify. The Board accepted Monk as an expert regarding the Baltimore County zoning and development regulations. He is a principal with Morris and Ritchie Associates, an "engineering, land planning, landscape, architectural surveying, consulting firm." Monk described what he perceived to be the unique physical attributes of the Property. Based on his observations and knowledge of the site and environs, he testified that the area and height of Trinity's proposed sign are necessitated by certain considerations: first, visibility by eastbound travelers on the Beltway is diminished by the Joppa Road overpass; second, that visibility is diminished further by "very bushy" vegetation planted along the Beltway; third, the sound barrier, chain link fence and evergreens that Pastor Raduano complained of create an "additional visual buffer"; and fourth, flowering trees lining the Beltway obfuscate seasonally the current identification sign for westbound travelers on the Beltway.[6] It was Monk's opinion that adherence to the letter of the Sign Law's area and height limitations "would be unnecessarily burdensome" for Trinity and that the sign pro-

---

6. Considering that the sign Trinity seeks would face eastbound traffic, it is not clear what the presence of trees, which cause westbound travelers to have diminished visibility of the current sign, contributes to Trinity's claimed need for the new sign.

posed by Trinity is still "within the spirit and intent of the regulations."

On cross-examination, Monk admitted that there were other churches and institutions in Baltimore County whose property is at or near the Beltway and who do not have signs with electronic messages discernable from the Beltway. Indeed, the view of one of those churches from the Beltway, Monk acknowledged, is completely blocked by the concrete sound barrier; whereas, Trinity benefits from a partial break in the barrier along the Property's border with the Beltway. Although noting several establishments with signs viewable from the Beltway, Monk agreed that they are in areas zoned for commercial use. Nonetheless, Monk was resolute in his belief that the "topography and other site conditions" put Trinity in a different circumstance than the other institutions on the Beltway. Monk further revealed that his opinion of Trinity's need for the proposed sign was driven not only by what he perceived to be unique physical attributes of the Property, but also by consideration of Trinity's uniqueness as an organization. To that effect, he stated:

The church has indicated earlier it's not a local church, it's a regional church.

And not only that, but previous testimony indicated they do other joint ventures [with] other churches, probably outside the immediate area.

That being said, it was a different context than the local facility, whether it be an athletic club or a business or some other destination that was common and local residents knew where it was.

Here, we are dealing with a different animal in [a] much more regional context, and the need to provide not only identity, but also whatever assistance is possible, based on their experiences, in giving some sort of directional orientation on how to get there.

After Trinity concluded its case-in-chief, People's Counsel called Jeffery Long, accepted by the Board as an expert in land use planning. Long has been employed by the Baltimore

County Office of Planning for 16 years. Long stated that the Office of Planning generally is opposed to placing signs along the Beltway, but it would not "attempt ... to deny a reasonable sign ... and would never control content in any way." He explained that his "over-arching concern is the size of the [proposed] sign, which is unprecedented for an institutional use of this sort." This concern, according to Long, is made more serious because the Maryland State Highway Administration plans to widen the Beltway and will need to place traffic warning signs approaching the I–695/I–83 interchange.

Long opined that the Property is not unique. He reached this conclusion from studying the properties of other churches and institutions that abut major highways in Baltimore County. Long asserted that the Property's topography is quite similar to those other places in the County. He also expressed a view that Trinity can be identified from the Beltway more readily than other comparably situated institutions because of the break in the concrete sound barrier.

Long stated that the Sign Law permits reasonable signage and that Trinity's 36 square-foot sign on West Joppa Road is sufficient. Moreover, he observed that several churches have signs with changeable copy capabilities that, nonetheless, adhere to the permitted size limits of the Sign Law. Those signs, Long elaborated, "are all oriented towards local roads." Long also testified to his belief that Trinity's proposed sign is so large that it would not be subordinate (as should be a normal identification sign) to the Property's principal use as a church; instead, he suggested, the sign itself would be a primary or principal use of the Property.

On cross-examination by Trinity, Long acknowledged that, in forming his opinion that the Property is not unique, some of the institutions he used for comparison are located at or near the westbound lanes of the Beltway; whereas, the Property abuts the eastbound lanes. He conceded that the Property is located near an overpass, a characteristic not shared with other locations, and that one of the churches to which he

compared Trinity actually sits on land that places it more than 20 feet above the elevation of the highway.

Randall Scott, Assistant District Engineer for Traffic with the Maryland State Highway Administration (the "SHA"), was People's Counsel's next witness. The Board accepted him as an SHA spokesperson and noted his experience analyzing accident data; however, the Board did not accept him as an expert, despite protestations by People's Counsel. Scott testified to an accident study that focused on the stretch of the Beltway that includes the Property's border. According to Scott, the general area of the I–695/I–83 interchange has an accident rate that is "significantly above the state average for similar type highways." Scott testified further that he is concerned about weaving patterns of traffic in the vicinity of Trinity's proposed sign. Regarding the MUTCD, Scott stated that the State relies on it where it applies; however, "regulatory warning signs and guide signs [are] the predominant focus of the manual." He explained that "the [MUTCD] is very explicit that signs [sic] should only be deployed along the highway if it fulfills a legitimate need, so signs having a purely advertising or commercial aspect would be discouraged." He elaborated that "need," as he used the term, refers to warnings for dangerous road conditions, speed limits, and guidance for motorists.

On cross-examination, Scott clarified that the MUTCD does not discourage identification signs. He admitted that the accident study he discussed did not address the causes of the accidents in the area of the I–695/I–83 interchange and that he has not compared the weaving patterns of traffic at that location with other similarly situated stretches of highway.

After Scott, John Dillon spoke on behalf of the Valleys Planning Council, Inc., apparently a community organization involved in preservation efforts in Baltimore County. The Board recognized that Dillon testified before the Board several times previously in other cases and accepted him as an expert in planning and zoning matters. Dillon made clear his belief that Trinity's proposed sign would be a traffic safety

hazard. He testified that Trinity's sanctuary already is viewable easily by eastbound travelers on the Beltway and that "[t]he church itself [is] . . . its own identification sign." Furthermore, because Trinity is so apparent from the Beltway, he opined that all Trinity needs reasonably to identify itself is a sign with its name. Dillon believed this could be accomplished without the desired variances. Regarding Trinity's existing 36 square-foot sign on West Joppa Road, Dillon testified that most churches in the surrounding community have signs consistent with that sign "in terms of size and clarity." Moreover, he noted that recent utility work along West Joppa Road resulted in the clearing of trees and underbrush, further enhancing that existing sign's visibility.

On cross-examination, Dillon acknowledged that, in arriving at his opinion that the proposed sign would be a traffic safety concern, he did not conduct any studies regarding driver distraction; rather, he said his opinion was based on many years of driving the Beltway.

Donald Girding of the Greater Timonium Community Council testified next for People's Counsel. He likewise said that Trinity can be seen easily by eastbound travelers on the Beltway and that no other churches have signs similar to that proposed by Trinity. Girding also emphasized his organization's position that the proposed sign would have a negative impact on traffic safety; however, on cross-examination, he revealed that his organization rarely supported variance requests and that Trinity's proposed sign would undermine his organization's conservation efforts in Baltimore County.

A handful of individual residents from the neighboring communities also voiced their opposition to Trinity's proposed sign. All of them were troubled by potential traffic problems, diminished aesthetics, and lowered property values linked by them to the proposed sign, if allowed.

On 2 July 2004, the Board rendered a lengthy written opinion and order in which it detailed the evidence. The Board concluded that the physical attributes of the Property did not make it unique and that compliance with the Sign Law

would not result in practical difficulty for Trinity. Accordingly, the Board denied the variances. Of significance to the Board appeared to be its view that motorists must be alert and not distracted when driving the stretch of the I–695/I–83 interchange. It found compelling Randall Scott's testimony, based on a study of accidents on the Beltway, that the proposed sign would pose a traffic safety concern.

Regarding the issue of uniqueness, the Board gave considerable weight to the testimony of Jeffrey Long. According to the Board, "being adjacent to the Beltway does not, in and of itself, constitute uniqueness." The Board was not impressed by Dr. Claus's testimony because of the comparatively short amount of time he spent preparing for his testimony and because he had only a limited knowledge of the Beltway, had not reviewed the County's Master Plan, and did not know the name of the community in which Trinity is located. It found that Dr. Claus testified to "generalities and not specifics." The Board was troubled also by Dr. Claus's association with groups dedicated to promoting signs. Likewise, the Board was unimpressed by William Monk's testimony. It did not consider unique the features that he described because they are "commonly found in many areas [along] the Beltway." The Board also found that neither Pastor Raduano's testimony nor that of Ellis Shapos established that the Property is unique within the meaning of the law of variances.

With respect to the practical difficulty criterion, the Board believed that Trinity's request "is really one of 'desire' or 'want,' rather than one of 'need.[']" The Board noted that Trinity provides directions on its web-site and on business cards and that other churches with no Beltway visibility do not have signs similar to what Trinity proposed. The Board was not convinced that Trinity would suffer from denial of the variances. It also alluded to findings of fact and policy rendered by the County Council in adopting the Sign Law: the "legislative arm of the government has gone on record as not being in favor of signage similar to that proposed by [Trinity]." Moreover, the Board cited a provision of the Zoning Code directing it to construe strictly the Sign Law

when considering a request for a variance from its standards and limitations. Trinity's proposed sign, the Board concluded, would be a danger to motorists and inconsistent with the nature of the surrounding community.

Trinity filed a Petition for Judicial Review in the Circuit Court for Baltimore County claiming that the Board misapplied the variance standards, the Sign Law is unconstitutional as applied to Trinity, and the Board failed to apply the RLUIPA, which requires a zoning body to demonstrate a compelling government interest if a land use decision places a substantial burden on an institution's religious exercise. On 31 May 2005, the Circuit Court issued a written judgment and order, holding that the Board applied correctly the law of variances and that, under the generally deferential standards of review for administrative decisions, the Board's findings were supported sufficiently by the evidence in the record. The Circuit Court also held that Trinity's constitutional arguments were meritless because the Sign Law does not restrict impermissibly Trinity's rights to freedom of speech or freedom of religion.[7] With respect to Trinity's RLUIPA argument, however, the Circuit Court remanded the case to the Board to consider whether the denial of the requested variances imposes a substantial burden on Trinity's religious exercise and, if so, whether that denial is the least restrictive means of serving a compelling government interest.

On remand, the Board took no additional evidence, but heard oral argument from the parties. It was Trinity's position that the proposed sign is a form of religious exercise, as contemplated by the RLUIPA, because it would allow the church to proselytize and attract additional parishioners in accordance with its missionary ministry. Trinity further contended that People's Counsel had not shown how the Board's denial of the variances is the least restrictive means of serving a compelling government interest. The Board disagreed and, in another written opinion and order dated 8 March 2006,

---

7. Trinity did not press its constitutional challenges beyond the Circuit Court.

concluded that denial of the variances does not violate the RLUIPA.

In its later opinion, the Board again had recourse to the factual and policy findings made by the County Council when it enacted the Sign Law, noting that excessive signage creates a traffic safety hazard and "impair[s] the utility of the highway system," undermines conservation efforts, and diminishes neighborhood aesthetics and property values. The Board also reiterated its legislative mandate to construe strictly the Sign Law when considering a variance request. Accordingly, the Board found that application of the limits of the Sign Law, without variation, is the least restrictive means of advancing a compelling government interest in protecting the community in this case.

The Board also found that denial of the requested variances does not pose a substantial burden on Trinity's religious exercise. Although no express finding was made that Trinity's use of the proposed sign would constitute religious exercise, the Board cited Pastor Raduano's testimony that "this is our ministry, this is what we are all about. This is what we do as a church." The Board concluded that Trinity has other practical ways to evangelize and to identify itself to potential parishioners. Specifically, the Board found:

[Trinity] sits on land adjacent to the Beltway (I–695) and a sound barrier which has been constructed along portions of the Beltway ends at a point where the Church is visible from the Beltway ... Although there is a chain link fence and trees planted in the area where the sound barrier ends, the Church is quite visible from the Beltway. The Pastor contended that the sign was needed in order to give direction to the potential attendees as to how they could reach the Church from the Beltway. In addition, the Pastor wanted to publicize upcoming events at the Church, such as Easter services and Christmas pageants. The Pastor also wanted to put supportive excerpts on the sign, such as "God Bless Our Troops" and scripture quotes. Trinity contended that the zoning regulations inhibited the Church in its

mission to attract new members and to conduct outreach to the community....

....

... [T]he record below is absolutely devoid of any evidence indicating that the religious activity of ... Trinity ... is inhibited in any way by the sign ordinance and the refusal to grant the type of sign requested by the Church. The Church contains a 2,400 sq. ft. sanctuary, and the testimony of the Pastor indicated that, on any given Sunday, approximately 1,500 individuals attend church [8] ... There were no facts or figures given with respect to church attendance at the present time or any evidence to show that church attendance was falling as a result of the fact that there was no large sign to advertise church functions. As noted in the previous Board decision, the Church has numerous ways of publicizing its activities and evangelizing. It has available to it newspapers, web sites, bulletin boards, radio and television advertising, and various other media outlets....

....

The totality of the testimony and evidence in this case causes the Board, as finder of fact, to conclude that ... Trinity[ ] is not prevented from using their property for its permitted purpose nor do such zoning restrictions as to height or area regulations render conformity with such restrictions unnecessarily burdensome. The position as presented by [Trinity] is really one of "desire" or "want" rather than one of "need"....

The Board concluded that denial of the requested variances does not violate the RLUIPA.

Again, Trinity sought judicial review of the Board's decision by the Circuit Court. On 23 January 2007, the Circuit Court concluded that the Board's denial of the requested variances does not violate the RLUIPA. Trinity filed a timely appeal to

---

8. The record reflects that Pastor Raduano actually testified that approximately 1300 people attend church services at Trinity each week. Nonetheless, this inconsistency does not appear to us to be significant to a resolution of the issues advanced in the case before us.

the Court of Special Appeals, which, in a reported opinion, affirmed. *Trinity Assembly of God of Balt. City, Inc. v. People's Counsel for Balt. County,* 178 Md.App. 232, 941 A.2d 560 (2008). Trinity filed with this Court a Petition for a Writ of Certiorari, which we granted. *Trinity Assembly v. People's Counsel,* 405 Md. 63, 949 A.2d 652 (2008). Trinity's petition posed the following questions:

I. Did the Board err as a matter of law when it found that denial of the requested variances does not impose a substantial burden on Trinity's religious exercise?

II. Did the Board apply the correct law of variances as to "uniqueness," and did it err in its determination that Trinity's burden was not met? [9]

We shall address these questions in reverse order.

### Standard of Review

When reviewing the decision of a local zoning body, such as the Board, we evaluate directly the agency decision, and, in so doing, we apply the same standards of review as the circuit court and intermediate appellate court. *People's Counsel for Balt. County v. Loyola College in Md.,* 406 Md. 54, 66, 956 A.2d 166, 173 (2008). "Our function . . . is not to substitute our assessment of the facts for those of the Board . . ., but merely to evaluate whether the evidence before the Board was 'fairly debatable'. . . ." *Pemberton v. Montgomery County,* 275 Md. 363, 367–68, 340 A.2d 240, 243 (1975). Nevertheless, we "may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated

---

**9.** We revised somewhat the questions presented. The actual questions were:

I. Did the Board err as a matter of law when it found that the proposed use constitutes religious exercise, but found compelling interests exist which present no substantial burden on religious exercise? Was the Board's denial of the variances arbitrary and capricious since Respondents failed to support their objections with legally sufficient empirical data?

II. Did the Board fail to apply the correct law of variances as to "uniqueness" and err in its determination that Petitioner's burden was not met?

**78**

by the agency." *United Parcel Serv., Inc. v. People's Counsel for Balt. County,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994) (quoting *United Steelworkers of America AFL–CIO, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 669, 472 A.2d 62, 64 (1984)).

 The scope of judicial review of administrative fact-finding is a narrow and highly deferential one. *Loyola College,* 406 Md. at 66, 956 A.2d at 173. Accordingly, we will affirm a decision on the facts if it is supported by "substantial evidence." *See id.* at 67, 956 A.2d at 173; *People's Counsel of Balt. County v. Surina,* 400 Md. 662, 681, 929 A.2d 899, 910 (2007); *see also Pemberton,* 275 Md. at 367, 340 A.2d at 243. A conclusion by a local zoning board satisfies the substantial evidence test if "a reasonable mind might accept as adequate" the evidence supporting it. *Loyola College,* 406 Md. at 67, 956 A.2d at 174 (quoting *Surina,* 400 Md. at 681, 929 A.2d at 910).

 Our review of the legal conclusions of a local zoning body, such as the Board, is less deferential, and we "may reverse those decisions where the legal conclusions reached by that body are based on an erroneous interpretation or application of the zoning statutes, regulations, and ordinances relevant and applicable to the property that is the subject of the dispute." *Surina,* 400 Md. at 682, 929 A.2d at 910. Nevertheless, "a degree of deference should often be accorded" the legal conclusions of an administrative agency regarding statutes, ordinances, or regulations that the agency is tasked with administering. *Id.* (quoting *Marzullo v. Kahl,* 366 Md. 158, 172, 783 A.2d 169, 177 (2001)). Thus, in analyzing whether the Board's decision was premised on an erroneous legal conclusion, we should take into consideration the relevant expertise of the Board. *See Loyola College,* 406 Md. at 67, 956 A.2d at 174; *Surina,* 400 Md. at 682–83, 929 A.2d at 911; *see also Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 68, 729 A.2d 376, 380 (1999).

In the present case, we must determine whether the Board applied the correct legal principles with regard to the prerequisites for the variances sought and whether the denial of the requested variances violates the RLUIPA. If the Board

correctly identified and applied the relevant laws, we must determine whether substantial evidence supported its conclusions.

## Analysis

### I.

■ "The general rule is that the authority to grant a variance should be exercised sparingly and only under exceptional circumstances." *Cromwell v. Ward,* 102 Md.App. 691, 703, 651 A.2d 424, 430 (1995). As the intermediate appellate court correctly pointed out, "[b]y means of definitions and a table of regulations, [Section 450 of the Zoning Code] controls the type, nature, size, and number of signs that may be erected on properties in Baltimore County." *Trinity Assembly of God,* 178 Md.App. at 239, 941 A.2d at 565. Under the Sign Law, an institution, including a church, is allowed one identification sign for each frontage of its property. BCZR § 450.4.[10] One of those signs may have changeable copy capabilities. *Id.* Whether containing changeable copy or not, such a sign may not exceed 25 square feet in face area nor be more than six feet high. *Id.*

The demands of the Sign Law, however, are not fixed immutably; the Board or Zoning Commissioner is allowed to grant a variance or variances in very limited circumstances. *Id.* § 307.1. In relevant part, the Zoning Code's variance provision provides:

[T]he power to grant variances ... [exists] only in cases where special circumstances or conditions exist that are peculiar to the land or structure which is the subject of the variance request and where strict compliance with the [Zoning Code] would result in practical difficulty or unreasonable hardship.[11]

---

**10.** As noted *supra* in note 4, we assume, without deciding, that the Sign Law permits Trinity to have a sign at the Property's border with the Beltway.

**11.** The Zoning Code's variance provision also directs that "any such variance shall be granted only if in strict harmony with the spirit and

*Id.* § 307.1. That provision, however, is tempered by another, which provides, "in considering requests for variances, provisions of [the Sign Law] shall be strictly construed, unless the demonstrable effect of a liberal construction would prevent or reduce the confusion and visual clutter caused by excessive signage." *Id.* § 450.8A.1.

More than a decade ago, Judge Dale R. Cathell, now retired from this Court and while a member of the Court of Special Appeals, noted that the Zoning Code's general variance provision essentially requires a petitioner to demonstrate two things: (1) uniqueness of the property and (2) practical difficulty or unreasonable hardship. *Cromwell,* 102 Md.App. at 698–99, 651 A.2d at 427–28. He elaborated:

> The first step requires a finding that the property whereon structures are to be placed (or uses conducted) is-in and of itself-unique and unusual in a manner different from the nature or surrounding properties such that the uniqueness and peculiarity of the subject property causes the zoning provision to impact disproportionately upon the property. Unless there is a finding that the property is unique, unusual or different, the process stops here and the variance is denied without any consideration of practical difficulty or unreasonable hardship. If that first step results in a supportable finding of uniqueness or unusualness, then a second step is taken in the process, i.e., a determination of

intent of the said ... regulations, and only in such manner as to grant relief without injury to the public health, safety and general welfare." BCZR § 301.1. We note that the Board did not make explicit findings with respect to these facets of the variance provision; however, the Board noted in its opinion that "the legislative arm of government has gone on record as not being in favor of signage similar to that proposed by [Trinity] ..., and, unless [Trinity] meets the burden imposed ... by law, [the Board] must, accordingly, deny such variance." It appears that the Board considered these concerns as part of its inquiry into whether the Sign Law causes Trinity to experience practical difficulty. In any event, because Trinity challenges only the Board's findings that there are no special circumstances peculiar to the Property and that compliance with the Sign Law does not cause practical difficulty for Trinity, we address here only those components of the Zoning Code's variance standards.

whether practical difficulty and/or unreasonable hardship, resulting from a disproportionate impact of the ordinance caused by the property's uniqueness, exists. Further consideration must then be given to the general purposes of the zoning ordinance.

*Id.* at 694–95, 651 A.2d at 426 (italics omitted). Similarly, this Court, interpreting Baltimore City's zoning code, said generally that a variance requires "proof of 'urgent necessity, hardship peculiar to the particular property, and a burden upon the owner not justified by the public health, safety and welfare.' " *Kennerly v. Mayor of Balt.*, 247 Md. 601, 606–07, 233 A.2d 800, 804 (1967) (quoting *Mayor of Balt. v. Polakoff*, 233 Md. 1, 9, 194 A.2d 819, 824 (1963)).

 To be "unique," a property must "have an inherent characteristic not shared by other properties in the area, i.e., its shape, topography, sub-surface condition, environmental factors, historical significance, access or non-access to navigable waters, practical restrictions imposed by abutting properties (such as obstructions) or other similar restrictions." *Lewis v. Dept. of Natural Resources*, 377 Md. 382, 434, 833 A.2d 563, 594 (2003) (italics omitted) (quoting *North v. St. Mary's County*, 99 Md.App. 502, 514, 638 A.2d 1175, 1181 (1994)). In its July 2004 written decision in the present case, the Board articulated correctly the legal test with which it was tasked to administer with respect to uniqueness. Relying on *Cromwell*, the Board expressed its understanding that " 'uniqueness' requires that the 'subject property have an inherent characteristic not shared by other properties in the area.' " To that end, the Board credited the testimony of People's Counsel's expert, Jeffery Long, over that of Trinity's expert, William Monk. The Board gave cogent reasons for why it found Long more convincing, including his familiarity with the local community and knowledge of the physical characteristics of similarly situated properties. The Board also noted that Trinity's other witnesses offered little in persuasive terms regarding how the Property is unique. Although Trinity contends that the Board did not give due regard to the Beltway as a factor contributing to the Property's uniqueness, Long testified that

other institutions abutting I–83 provide an equally useful comparison. The Board was permitted to credit his testimony. Perhaps the evidence presented by Trinity might have sustained a finding that the Property is unique; however, on this record, it was the Board's province to reconcile the competing or conflicting testimony. We agree with the Court of Special Appeals that substantial evidence supported the Board's finding of lack of uniqueness.

Nevertheless, Trinity maintains that the Board applied incorrectly the legal standard for uniqueness, namely the Board applied *Cromwell* too narrowly by focusing only on the physical attributes of the Property. Trinity asseverates that the Board should have considered also whether those attributes cause the Sign Law's area and height limitations to have a disproportionate impact on Trinity. In *Umerley v. People's Counsel for Balt. County,* the Court of Special Appeals opined that a zoning authority must determine, as part of its uniqueness inquiry, whether "the uniqueness or peculiarity of the property causes the zoning provision [at issue] to have a disproportionate impact." 108 Md.App. 497, 506, 672 A.2d 173, 177 (1996). Assuming that a disproportionate impact must be found before a local zoning authority may grant a variance, it is a logical fallacy to say that the Board erred on this score. The disproportionate impact consideration, if viable, exists because of the notion that it is not enough for a landowner or user to show merely that the property is somehow physically peculiar or unique; she, he, or it also must prove, to the satisfaction of the tribunal, a connection between the property's inherent characteristics and the manner in which the zoning law hurts the landowner or user. Where a property's physical peculiarities do not cause the landowner to suffer disproportionately due to application of the zoning enactment in question, the property is not "unique" in the law of variances. For example, if a property has physical characteristics that might justify variance relief from drainage or sewage regulations, those attributes probably would have no bearing on how the property is affected by an ordinance establishing the maximum height for a fence. Here, the Board

concluded simply that the physical attributes of the Property are not distinguishing. That conclusion is supported by substantial evidence. There was no need for the Board to go further to consider whether physical uniqueness (which it found does not exist) causes the Sign Law to affect Trinity disproportionately.

Although Trinity relies on *Umerley*, that case, to our reading, actually undercuts Trinity's argument that the Board erred in its assessment of uniqueness. In *Umerley*, the intermediate appellate court interpreted the same general variance provision of the Zoning Code that set the threshold in this case. 108 Md.App. at 508, 672 A.2d at 178. There, the petitioner sought a variance that would allow it to operate a trucking facility at its current location, which was not zoned for such activity. *Id.* at 502, 672 A.2d at 175. The court held that, because the uniqueness inquiry is concerned only with characteristics inherent to the property, the fact that the petitioner had been in operation at its current location since before the effective date of the ordinance prohibiting trucking activity did not render the property "unique." *Id.* at 508, 672 A.2d at 178. Here, William Monk, Trinity's principal expert regarding uniqueness, testified that his opinion was driven, in part, by Trinity's exceptionalness as an organization, not simply by the inherent physical uniqueness of the Property. To that end, he stated that Trinity is "not a local church, it's a regional church," which, in his view, makes it a "different animal" from other local institutions that might prosper with a smaller sign than Trinity believed it required.

■ With respect to the practical difficulty prong of the Zoning Code's variance standards, the Board applied the factors that this Court articulated in *McLean v. Soley*, 270 Md. 208, 310 A.2d 783 (1973). In *McLean* we adopted, from Professor Rathkopf's treatise, a three-part inquiry to guide local zoning authorities in determining whether a landowner established this element:

1) Whether compliance with the strict letter of the restrictions governing area, set backs, frontage, height, bulk or

density would unreasonably prevent the owner from using the property for a permitted purpose or would render conformity with such restrictions unnecessarily burdensome.

2) Whether a grant of the variance applied for would do substantial justice to the applicant as well as to other property owners in the district, or whether a lesser relaxation than that applied for would give substantial relief to the owner of the property involved and be more consistent with justice to other property owners.

3) Whether relief can be granted in such fashion that the spirit of the ordinance will be observed and public safety and welfare secured.

270 Md. at 214–15, 310 A.2d at 787 (citing 2 RATHKOPF, THE LAW OF ZONING & PLANNING 45–28, 29 (3d ed. 1972)).[12] The Board's use of the *McLean* test was not error. *See Red Roof Inns, Inc. v. People's Counsel for Balt. County,* 96 Md.App. 219, 225, 624 A.2d 1281, 1284 (1993) (applying *McLean* test).

The Board found that denial of the requested variances would not cause practical difficulty for Trinity because Trinity has been successful as an endeavor with its two current signs and because its sanctuary can be identified by eastbound travelers on the Beltway. Indeed, Pastor Raduano admitted that the West Joppa Road frontage of the Property, the location of Trinity's entrance and existing 36 square-foot identification sign, is well traveled. John Dillon testified that many churches in Baltimore County operate with signs similar to Trinity's West Joppa Road sign. Moreover, the Board noted also that the church itself is visible from the Beltway. In discounting Trinity's claim of a need for the proposed sign in order to provide directions for its would-be parishioners, the Board cited Pastor Raduano's testimony that Trinity provides directions on business cards and on its web-site. The Board also rejected Trinity's argument that the Sign Law does not allow Trinity to erect a reasonable sign on the

---

12. The relevant provision of Professor Rathkopf's treatise is currently available at 3 RATHKOPF, THE LAW OF ZONING & PLANNING 58–117 (Thompson Reuters/West 2008).

Beltway that adheres to the highway safety standards as interpreted by Trinity's experts. To the contrary, the Board credited the testimony of Randall Scott of the SHA, who described the traffic safety concerns associated with the location and size of the proposed sign. It was Scott's opinion that the proposed sign would be an unsafe distraction for motorists. The Board also cited factual and policy findings made by the County Council when it enacted the Sign Law. Those findings, the Board observed, demonstrate the Council's desire to foreclose "excessive and incompatible signage," which is distracting to motorists and causes property values to depreciate. The Board concluded that granting the requested variances would be at odds with that legislative expression, especially in light of the further rejoinder that the Board strictly construe the Sign Law when entertaining a variance request. Like its finding of lack of uniqueness, the Board's finding that Trinity will not suffer practical difficulty, under the *McLean* test, is supported by substantial evidence.

Trinity suggests, however, that the Board misinterpreted the legal standard for practical difficulty by analyzing the criterion only as it bears on Trinity's use of the Property for church purposes; instead, Trinity argues, the Board should have considered whether compliance with the Sign Law's area and height limitations renders it practically difficult for Trinity to exercise its right to have a changeable copy sign. Again, Trinity's argument is flawed by a logical fallacy. It assumes that the Board accepted Trinity's premise that the MUTCD dictates the minimum necessary area and height of Trinity's proposed sign. The Board, however, was persuaded by Scott's testimony that the sign Trinity proposed would create, not prevent, a traffic hazard, and, as observed previously, the Board was within its proper province to credit that testimony. Moreover, Jeffrey Long testified that Trinity's West Joppa Road frontage allows it to have an effective changeable copy sign, "just like most of the churches in the area." Thus, it was proper for the Board to consider practical difficulty as it bears on Trinity's ability to function as a church and to identify itself accordingly.

## II.

We turn now to Trinity's RLUIPA claim. As the intermediate appellate court noted, this Court previously has not had the opportunity to interpret and apply the RLUIPA. *Trinity Assembly of God*, 178 Md.App. at 253, 941 A.2d at 572. In relevant part, the RLUIPA provides:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000cc(a)(1).

Trinity's RLUIPA argument is as follows. The sign it seeks constitutes a form of religious exercise because it would identify the church for would-be parishioners and allow Trinity to evangelize by "disseminating scripture or uplifting messages," via changeable copy features, to eastbound travelers on the Beltway. The Board's refusal to grant variances for the proposed sign works a substantial burden on that exercise because, Trinity asserts, Beltway travelers will not be able to read messages on a sign limited by the height and area limitations of the Sign Law. Trinity argues further that, because it has shown a substantial burden on its religious exercise, the burden shifted to People's Counsel to prove that denial of the variances is the least restrictive means of advancing a compelling government interest, a burden that he failed to shoulder.

Some background on the RLUIPA is essential. In 1993, Congress enacted the RLUIPA's forerunner, the Religious Freedom Restoration Act (the "RFRA"), in response to what it perceived to be an erosion of religious liberty reflected in Supreme Court jurisprudence interpreting and applying the

Free Exercise Clause of the First Amendment. *See id.* § 2000bb(a). Three decades before Congress enacted the RFRA, the Supreme Court decided *Sherbert v. Verner,* which provided, in essence, that a government action that substantially burdens religious exercise must be justified by a compelling government interest and must reflect the least restrictive means of advancing that interest. 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *see also Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (applying the *Sherbert* test and holding that denial of unemployment benefits to Thomas, who lost his job because he refused on religious grounds to manufacture armaments, substantially burdened his religious exercise and was not justified by a compelling government interest). The substantial burden test (the *Sherbert* test) remained the law of the land governing claims under the Free Exercise Clause until 1990. In *Employment Div., Dep't of Human Resources of Or. v. Smith,* however, the Supreme Court held that a neutral law, "enforc[ing] generally applicable prohibitions," does not need to be justified by a compelling government interest, even if the law incidentally burdens religious exercise. 494 U.S. 872, 885, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The Court opined that any other rule "would be courting anarchy...." *Id.* at 888, 110 S.Ct. 1595. The Court turned its back on the substantial burden test, noting that it "was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct," namely unemployment compensation. *Id.* at 884, 110 S.Ct. 1595.[13]

Congress enacted the RFRA to respond to *Smith. See* 42 U.S.C.A. § 2000bb(a)(4) (making a predicate finding that "in

---

**13.** As we shall explain, the RLUIPA applies to the present case because the Board made an individualized assessment when it denied Trinity's request for variances. *Smith* left open the possibility that the substantial burden test still applies to Free Exercise Clause challenges where the government made an individualized assessment. But, as we noted *supra* in note 7, Trinity does not prosecute a Free Exercise claim here.

... *Smith* ... the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion"); *City of Boerne v. Flores,* 521 U.S. 507, 513, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (noting that "Congress enacted RFRA in direct response to ... *Smith*"). In doing so, Congress cited its Fourteenth Amendment enforcement power as the basis for its action. *Flores,* 521 U.S. at 517, 117 S.Ct. 2157 (citing relevant Senate and House reports).[14] Congress disagreed that application of the substantial burden test would invite anarchy, finding instead that it "is a workable test for striking sensible balances between religious liberty and competing prior government interests." 42 U.S.C.A. § 2000bb(a)(5). Congress found further that neutral, generally applicable laws nonetheless may have the effect of burdening religious exercise to the same degree as laws intended to stifle such exercise. *Id.* § 2000bb(a)(2). Accordingly, the RFRA announced that "[g]overnment shall not substantially burden a person's exercise of religion[,] even if the burden results from a rule of general applicability ... [unless] it demonstrates that application of the burden ... is in furtherance of a compelling governmental interest[ ] and is the least restrictive means of furthering that ... interest." *Id.* § 2000bb–1 (a) & (b). An attack on the RFRA, however, was quick and decisive. In *City of Boerne v. Flores,* the Supreme Court partially invalidated the RFRA, holding that the enforcement power granted to Congress by the Fourteenth Amendment did not empower Congress to impose universally the substantial burden test on state and local governments. 521 U.S. at 519–20, 117 S.Ct. 2157. The Court reasoned that the Fourteenth Amendment gave Congress only the authority to remedy constitutional violations, "not the power to determine what constitutes a constitutional violation." *Id.* at 519, 117 S.Ct. 2157; *see also*

---

**14.** The Fourteenth Amendment provides, in pertinent part, that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. CONST. amend. XIV, § 5.

*Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1236 (11th Cir.2004) (noting that, "by enacting RFRA, Congress had exceeded [its] authority by *defining* rights instead of simply *enforcing* them" (italics in original)).[15]

Refusing to be stymied, Congress enacted the RLUIPA, which "is largely a reprisal of ... the RFRA, but its scope is limited to laws and regulations that govern (1) land use and (2) institutions such as prisons that receive federal funds." *Adkins v. Kaspar,* 393 F.3d 559, 567 (5th Cir.2004). After three years of hearings, Congress found that actions by state and local governments, in these two areas particularly, threaten religious exercise. 146 CONG. REC. S7774 (2000) (statement of Sen. Hatch).[16] To ensure that the RLUIPA did not suffer the same fate as the RFRA, Congress circumscribed the reach of the substantial burden test. With regard to land use regulations, Congress delineated three instances in which it applies:

(A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;

(B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or

(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the govern-

---

**15.** The RFRA nonetheless applies to the federal government. *E.g., Hankins v. Lyght,* 441 F.3d 96, 105 (2d Cir.2006); *O'Bryan v. Bureau of Prisons,* 349 F.3d 399, 400–01 (7th Cir.2003); *Kikumura v. Hurley,* 242 F.3d 950, 959 (10th Cir.2001).

**16.** *See also* Jennifer S. Evans–Cowley & Kenneth Pearlman, *Six Flags Over Jesus: RLUIPA, Megachurches, and Zoning,* 21 TUL. ENVTL. L.J. 203, 212 (2008) ("In passing RLUIPA, Congress sought to avoid the issues raised in *[Flores]* by identifying two areas in which Congress believes remedial legislation is necessary: land use and incarcerated persons").

ment to make, individualized assessments of the proposed uses for the property involved.

42 U.S.C.A. § 2000cc(a)(2).

Subsections (A) and (B) are anchored in the powers conferred on Congress, respectively, by the Spending and Commerce Clauses of the Constitution. Subsection (C), like the RFRA, is rooted in the enforcement power of the Fourteenth Amendment; however, Congress has found, and is now attempting to remedy through the RLUIPA, what it perceives as "a widespread practice" of zoning authorities using individualized assessment procedures to deny covertly permission to use real property on the basis of religion, while ostensibly basing their decisions on neutral considerations, such as safety and aesthetics. 146 CONG. REC. S7774.

In the present case, we need not ponder on the first two subsections because the Zoning Code's variance process involves "individualized assessments," as contemplated by subsection (C). That provision applies wherever "the government may take into account the particular details of an applicant's proposed use of land." *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 986 (9th Cir. 2006). And, as the Supreme Court of Michigan noted when applying the RLUIPA, "[w]hen one requests a variance, one is requesting permission to use the property for a *specific use.*" *Greater Bible Way Temple of Jackson v. City of Jackson*, 478 Mich. 373, 733 N.W.2d 734, 744 n. 14 (2007) (italics in original) (contrasting a petition for a variance with a request to rezone property). Thus, the variance process here necessarily entails an individualized assessment. The Zoning Code enables the Board or the Zoning Commissioner to grant a variance or variances from the Sign Law "where special circumstances or conditions exist that are peculiar to the land or structure ... and where strict compliance ... would result in practical difficulty or unreasonable hardship." BCZR § 307.1. As discussed, the Board took evidence to determine whether the Property is unique and whether compliance with the limits set by the Sign Law would cause practical difficulty for Trinity.[17]

---

17. We disagree with contrary reasoning found in an opinion of the Supreme Court of Connecticut. In *Cambodian Buddhist Soc'y of Conn.,*

Accordingly, the substantial burden test applies pursuant to subsection (C).[18]

As stated, the RLUIPA provides that application of a land use regulation may not impose a substantial burden on religious exercise unless it is the least restrictive means of advancing a compelling government interest. The RLUIPA defines "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land)...." 42 U.S.C.A. § 2000cc–5(5). "Religious exercise" is defined broadly, "includ[ing] any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc–5(7)(A). Moreover, the RLUIPA specifically embraces religious exercise as including "[t]he use, building, or conversion of real property" for a religious purpose. *Id.* § 2000cc–5(7)(B). Obviously, the Sign Law and

---

*Inc. v. Planning & Zoning Comm'n of Newtown,* the Connecticut court held that the zoning code of the town of Newton did not contemplate "individualized assessments," as the term is used in the RLUIPA, because the local zoning commission applied the identical standards to all facilities, religious and nonreligious, when considering whether to approve a proposed property use. 285 Conn. 381, 941 A.2d 868, 893 (2008). We reject this view because another provision of the RLUIPA, separate and distinct from its "substantial burden" provision, precludes a zoning authority from treating a religious institution "on less than equal terms" with a non-religious organization. *See* 42 U.S.C.A. § 2000cc(b).

**18.** To date, there have been a handful of attacks on the constitutionality of subsection (C) under the enforcement power of the Fourteenth Amendment. Our research indicates that courts considering the issue consistently have held subsection (C) to be an appropriate exercise of that power. *See, e.g., Guru Nanak Sikh Soc'y,* 456 F.3d at 993; *United States v. Maui County,* 298 F.Supp.2d 1010, 1016 (D.Haw.2003). Because we resolve the present case on non-constitutional grounds, we need not opine as to the constitutionality of subsection (C). *See, e.g., VNA Hospice of Md. v. Dep't of Health & Mental Hygiene,* 406 Md. 584, 607–10, 961 A.2d 557, 571–72 (2008) (declining to decide the constitutional questions on which we granted certiorari and electing instead to resolve the case based on a non-constitutional issue fairly presented by the record but abandoned by petitioner after its disposition by a circuit court); *Robinson v. State,* 404 Md. 208, 217, 946 A.2d 456, 461 (2008) (noting, "it is this Court's established policy to decide a constitutional issue only when necessary").

the provision for variances from its standards are land use regulations. Trinity contends that erecting and maintaining the proposed sign would constitute religious exercise because Trinity would use the sign to "disseminat[e] scripture or uplifting messages to passers-by." People's Counsel did not argue, and the Board did not decide, whether Trinity's contention is correct. We shall assume, without deciding, that Trinity's use of the sign it proposed would constitute religious exercise as defined by the RLUIPA.[19]

In this matter, the secular battle over whether the Board's denial of the variances violates the RLUIPA has been fought mostly along the "substantial burden" front. "Courts presume, in interpreting statutes, that '[t]he law uses familiar legal expressions in their familiar legal sense.'" *United States v. Dodson*, 291 F.3d 268, 271 (4th Cir.2002) (alteration in original) (quoting *Bradley v. United States*, 410 U.S. 605, 609, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973)). "In the absence of a contrary indication, [courts] assume that when a statute uses such a term, Congress intended it to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991); *Ala. Power Co. v. U.S. EPA*, 40 F.3d 450, 454 (D.C.Cir.1994). Thus, while the RLUIPA does not define explicitly "substantial burden," we presume that Congress intended for the term to mean what it did under pre-*Smith* Free Exercise jurisprudence and under the RFRA. The pertinent legislative history also suggests that Congress intended that the term have this well-established meaning. First, the RLUIPA is simply a more focused version of the RFRA, which had, as its express purpose, restoring

---

**19.** We note in passing only that, in *Greater Bible Way Temple of Jackson v. City of Jackson*, the Supreme Court of Michigan held, *inter alia*, that a church's proposal to build and operate apartments did not qualify as "religious exercise" under the RLUIPA, even though the church claimed that the apartments would enable it "to further the teachings of Jesus Christ by providing housing to the citizens of [the city]." 733 N.W.2d at 746. The Michigan court noted that there was no evidence that the church intended to use the apartments for religious worship; the fact that the church was a religious institution did not transmute an otherwise "commercial exercise" into religious exercise. *Id.*

the *Sherbert* test. *See Adkins,* 393 F.3d at 567 (noting that RLUIPA is "largely a reprisal" of RFRA); *see also* 42 U.S.C.A. § 2000bb(b)(1) (stating purpose of RFRA). Second, a joint statement by Senators Hatch and Kennedy, cosponsors of the RLUIPA, indicates that Congress intended for courts to interpret the term by reference to its earlier use in the Free Exercise Clause context. 146 Cong. Rec. S7776. *See also Adkins,* 393 F.3d at 569 (noting the same). With this in mind, we must gauge the reach of "substantial burden." [20]

 In *Sherbert,* the Supreme Court held that a substantial burden on religious exercise exists when an adherent is "force[d] to choose between following the precepts of her religion and forfeiting benefits on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." 374 U.S. at 404, 83 S.Ct. 1790. The Court elaborated in *Thomas* that a substantial burden exists if the government "conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief." 450 U.S. at 717–18, 101 S.Ct. 1425. A law, however, does not impose a substantial burden on religious exercise if it simply "operates as to make the practice of . . . religious beliefs more expensive." *Braunfeld v. Brown,* 366 U.S. 599, 605, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). Similarly, government action "which may make it more difficult to practice certain religions but which ha[s] no tendency to coerce individuals into acting contrary to their religious beliefs" does not qualify as a substantial burden. *Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988).

---

**20.** People's Counsel maintains that Trinity is not subject to a substantial burden within the meaning of the RLUIPA because Trinity is treated like everyone else; however, a separate RLUIPA provision prohibits a zoning authority from imposing a greater burden on a religious institution than on a non-religious institution. *See* 42 U.S.C.A. § 2000cc(b)(1). Accordingly, the substantial burden prohibition must mean something different from the greater burden prohibition. *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin,* 396 F.3d 895, 900 (7th Cir.2005) (rejecting a similar argument).

The U.S. Court of Appeals for the Fourth Circuit considered what constitutes a substantial burden under the RLUIPA, applied in the context of institutionalized persons, and said that "a substantial burden on religious exercise occurs when a ... government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir.2006) (alterations in original) (quoting *Thomas*, 450 U.S. at 718, 101 S.Ct. 1425).[21] Other federal circuit courts of appeal provide further guidance regarding the RLUIPA's application to land use regulations. The Ninth Circuit emphasized that, "for a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great extent.' That is a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Guru Nanak Sikh Soc'y* 456 F.3d at 988; *San Jose Christian College v. City of Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir.2004). The Eleventh Circuit opined:

> [A] "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

*Midrash Sephardi,* 366 F.3d at 1227.

 The standards articulated by the Ninth and Eleventh Circuits provide useful beacons for our consideration of when a land use regulation or action works a substantial burden on an institution's religious exercise.[22] Based on that

---

**21.** Recently, Judge Titus of the U.S. District Court for the District of Maryland signaled his approval of this standard for land use cases under the RLUIPA. *See Reaching Hearts Int'l, Inc. v. Prince George's County,* 584 F.Supp.2d 766, 785–86, 2008 WL 4817008, *15 (D.Md. 2008) (approving jury instructions consistent with *Lovelace*).

**22.** In *Murphy v. Mo. Dep't of Corr.,* the Eighth Circuit held that, to qualify as a substantial burden under the RLUIPA, the government

guidance, we deem Trinity's argument an overly simplified and mechanical application of the RLUIPA. Essentially, Trinity argues that the sign it wants constitutes religious exercise; that the Board will not let it have the sign it wants; and, thus, the Board's refusal substantially burdens Trinity's religious exercise. This rote application of the RLUIPA does not persuade us because it renders the "substantial burden" element largely nugatory; it suggests that a restriction on land use qualifies as a "substantial burden," even if it actually poses only a slight impediment to religious exercise. *See Civil Liberties for Urban Believers (CLUB) v. City of Chicago*, 342 F.3d 752, 761 (7th Cir.2003) (rejecting a similar argument).[23] Although it is true that the definition of religious exercise includes the use of real property for a religious purpose, 42 U.S.C.A. § 2000cc–5(7)(B), a zoning restriction affecting that property is not a substantial burden on religious exercise unless the restriction "prevents adherents from conducting or

---

action in question must bear on "some central tenet" of the complainant's religious belief system or prevent the complainant from engaging in an exercise that is "fundamental" to that belief system. 372 F.3d 979, 988 (8th Cir.2004) (applying "substantial burden" in institutionalized persons context). We reject this model as inconsistent with our reading of RLUIPA's definition of "religious exercise," which provides that the impaired exercise need not be "compelled by, [n]or central to" a complainant's belief system. 42 U.S.C.A. § 2000cc–5(7)(A). Other courts have rejected the Eighth Circuit's approach for the same reason. *E.g., Adkins*, 393 F.3d at 568 n. 37; *Greater Bible Way Temple*, 733 N.W.2d at 749 n. 22.

**23.** While we agree with the Seventh Circuit on this point, we do not adopt its entire reasoning. In *CLUB*, the court went on to hold:

[I]n the context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction generally—effectively impracticable.

342 F.3d at 761. We do not agree that the bar should be set so high that a religious institution must prove that its religious exercise is rendered "effectively impracticable." Rather, we think that the definitions employed by the Ninth and Eleventh Circuits hew closer to the well-established meaning of "substantial burden" in the Free Exercise context.

expressing their religious beliefs or causes them to forgo religious precepts." *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,* 406 F.Supp.2d 507, 515 (D.N.J.2005) (rejecting a similar argument and noting that a burden on religious exercise is not the same as a burden on the use of property), *vacated on other grounds,* 510 F.3d 253 (3d Cir. 2007). Stated in more concrete terms, "[w]here the denial of an institution's application to build [on its property] will have minimal impact on the institution's religious exercise, it does not constitute a substantial burden, *even when the denial is definitive." Westchester Day School v. Village of Mamaroneck,* 504 F.3d 338, 349 (2d Cir.2007) (italics added).

 We resolve that, under the RLUIPA, a land use regulation, or a zoning authority's application of it, imposes a substantial burden on religious exercise only if it leaves the aggrieved religious institution without a reasonable means to observe a particular religious precept. Such a regulation would be "oppressive to a significantly great extent." *See Guru Nanak Sikh Soc'y,* 456 F.3d at 988 (internal quotations omitted). If, however, the religious institution may adhere to that precept through some viable alternative mode, the land use regulation at issue is not a substantial burden on religious exercise, even though it may make that exercise more difficult or expensive. *Cf. Lyng,* 485 U.S. at 450, 108 S.Ct. 1319 (noting that government action making it more difficult to practice religion is not a substantial burden unless it coerces religious adherents); *Braunfeld,* 366 U.S. at 605, 81 S.Ct. 1144 (noting that a law making it more expensive to adhere to religious beliefs does not amount to a substantial burden). Indeed, a zoning authority need not subsidize a religious group by applying a regulation in a manner that makes it easier or cheaper for the group to follow its beliefs. *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. City of West Linn,* 338 Or. 453, 111 P.3d 1123, 1130 (2005); *cf. Battles v. Anne Arundel County Bd. of Educ.,* 904 F.Supp. 471, 477 (D.Md.1995) (holding that the RFRA did not require school board to subsidize home-schooling parent by eliminating non-Christian viewpoints from man-

datory home-schooling curriculum). Moreover, legitimate and "run of the mill" zoning requirements rarely, if ever, will rise to the level of a substantial burden. *Midrash Sephardi*, 366 F.3d at 1227 n. 11.

In the present case, we hold that the Board correctly assessed the law regarding what constitutes a substantial burden on religious exercise under the RLUIPA. We also hold that the Board properly found that the impediment to Trinity in this case does not rise to the level of a substantial burden. Although Trinity asserts in its brief that, without its desired sign, it is not able "to reach out and spread its message," that simply is not the case. First, Trinity has not been substantially burdened "when the solution to a majority of [its] myriad constraints appears to lie within [its] control." *See Episcopal Student Found. v. City of Ann Arbor*, 341 F.Supp.2d 691, 704 (E.D.Mich.2004). As the Board noted in both of its opinions in this case, Trinity "has numerous ways of publicizing its activities and evangelizing. It has available to it newspapers, web sites, bulletin boards, radio and television advertising, and various other media outlets." Furthermore, if Trinity believes that a sign that complies with the Sign Law could not be read by eastbound Beltway travelers, Trinity still has its frontage on West Joppa Road, which Pastor Raduano acknowledged is well-traveled. A changeable copy sign at that location would identify Trinity and allow it to evangelize, although perhaps not reaching as sizable an audience as would a 250 square-foot sign viewable from the eastbound lanes of the Beltway. Second, "[t]he burden on religious practice is not great when the government action . . . does not restrict current religious practice but rather prevents a change in religious practice." *Christian Gospel Church v. City of San Francisco*, 896 F.2d 1221, 1224 (9th Cir.1990) (applying Free Exercise Clause). Trinity's sanctuary already is visible and readily identifiable from the Beltway. Trinity currently has two identification signs. As the Board noted, approximately 1,500 people attend church services "on any given Sunday." Moreover, the Board noted also that there was no "evidence to show that church attendance was falling as a result of the fact

that there was no large sign to advertise church functions." Even Trinity acknowledges in its brief that the Board's decision only prevents Trinity's parishioners from "practicing their religion *as they see fit.*" (italics added). We agree with Trinity that the Board's decision has this effect; however, the ability to practice religion as one sees fit is not the appropriate touchstone in a substantial burden analysis under the RLUIPA. Accordingly, substantial evidence supports the Board's decision that denial of a variance for Trinity's proposed sign does not impose a substantial burden on Trinity.[24]

Without subscribing necessarily to the reasoning or holdings expressed there, we note that our holding here is consistent with the opinions of a number of federal and other state courts applying the RLUIPA. For example, in *Midrash Sephardi, Inc. v. Town of Surfside*, the Eleventh Circuit held that a zoning scheme precluding houses of worship in commercially zoned areas was not a substantial burden on the religious exercise of two Orthodox Jewish synagogues. 366 F.3d at 1228. The synagogues asseverated that their faith did not allow them to drive to Sabbath services and that only the commercially zoned district they desired for synagogue use was amenable for walking to services. *Id.* at 1227. They contended that old or ill congregants effectively would be forced to stop attending services if the synagogues had to locate elsewhere; however, the court considered the inconvenience of walking a few extra blocks to be a relatively small burden on the synagogues' members' religious exercise. *Id.* at 1227–28. In *Greater Bible Way Temple of Jackson v. City of Jackson*, the Supreme Court of Michigan held that a city's refusal to rezone a church's property for the church to build

---

24. Trinity also contends that the Board's decision is arbitrary and capricious because the Board failed to articulate a legal test for determining what constitutes a substantial burden under the RLUIPA. This argument, however, is plainly wrong. The Board relied on *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 326 F.Supp.2d 1140, 1152 (E.D.Cal.2003), *aff'd*, 456 F.3d 978. To that end, the Board said, "[t]o meet the 'substantial burden' standard, the government conduct being challenged must actually inhibit religious activity in a concrete way and cause more than a mere inconvenience." (emphasis omitted).

and operate apartments for elderly and disabled persons was not a substantial burden on the church's religious exercise. 733 N.W.2d at 750. The court reasoned that the church could acquire property at a different location zoned for apartments. *Id.* Moreover, the court noted that the church could use the subject property for housing, as long as it built single-family houses. *Id.*

The U.S. District Court for the Eastern District of Michigan, in *Episcopal Student Found. v. City of Ann Arbor*, held that a city's denial of a permit for a church to build a larger structure on its property did not impose a substantial burden on the church's religious exercise. 341 F.Supp.2d at 707. The church argued that it needed the extra space to accommodate new members, conduct outreach to the poor, and so that all of its parishioners could worship together at the same time. *Id.* at 704. The court, however, was not persuaded. *Id.* It reasoned that the church had a second-floor room, which it leased to other groups, and that the church could use that room to accommodate its need for additional space. *Id.* The church could rent another church's property or a meeting hall and hold services elsewhere. *Id.* at 705. Moreover, the court highlighted the fact that the church could continue helping the poor in other ways, through financial contributions and by serving meals at other locations in the city. *Id.* Although a larger structure on the subject property would be "incredibly beneficial" to the church's outreach, not having the space that it desired was not a substantial burden on its religious exercise. *Id.*

A comparison of the cases in which courts have found substantial burdens on religious exercises do not lend succor to Trinity. In *Westchester Day School v. Village of Mamaroneck*, the Second Circuit divined a substantial burden on religious exercise in the village's denial of a special use permit for a Jewish religious school to build new facilities for its students. 504 F.3d at 352–53. There, the court noted that the school's current facilities were inadequate and that continuing to teach in them was not a legitimate course of action for the school. *Id.* at 352. Nonetheless, the court signaled

that a different result would obtain if the school could "rear-range existing classrooms to meet its religious needs in the face of a rejected application to renovate." *Id.* at 349. In *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter,* the Ninth Circuit held that the county's denial of a conditional use permit for a Sikh organization to build a temple at its proposed location imposed a substantial burden on the organization because the county's denial left the organization with little possibility of building a temple anywhere. 456 F.3d at 991–92. And in *Reaching Hearts Int'l, Inc. v. Prince George's County,* which was decided after the present case was briefed and argued, the U.S. District Court for the District of Maryland concluded that there was sufficient evidence to uphold a jury's finding that the county substantially burdened a church's religious exercise by denying the church's sewage category change application for a proposed church facility. 584 F.Supp.2d 766, 2008 WL 4817008, *17 (D.Md.2008). In doing so, the court relied on the fact that the denial left the church without adequate space for its congregation. *Id.* at 787–88, 2008 WL 4817008 at *16. The court noted that renting a facility at a different location was not a sustainable option for the church because it required members to set-up for services, violating their religious belief against working on the Sabbath. *Id.* Moreover, the district court distinguished the case before it from others where limits on the sizes of structures were not considered substantial burdens, noting that the church basically was precluded from having any structure requiring sewer service on its property. *Id.* at 785–86, 2008 WL 4817008 at *15. In the present case, however, the Board found, and we agree, that Trinity's request for a variance, to erect a 250 square-foot electronic sign, "is really one of 'desire' or 'want' rather than one of 'need.[']"

In affirming the Board's, Circuit Court's, and Court of Special Appeals's decisions that the denial of Trinity's requested variances does not impose a substantial burden on Trinity's religious exercise, we conclude that neither the Board's decision nor the Sign Law violate the RLUIPA on this record. Accordingly, we need not decide whether the Sign Law and

the Board's denial of the variances are the least restrictive means of advancing a compelling government interest.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY PETITIONER.**