***Julia and Ryan King, et al. v. Cornelius David Helfrich, et al.***
No. 2094, September Term 2022


**Land Use – Zoning and Planning – Variances**.  In Baltimore County, a zoning agency may grant a variance from the zoning regulations otherwise applicable to a property only if, among other things, that property satisfies the "uniqueness" condition for a variance. To satisfy the uniqueness test, a property must have an inherent characteristic not shared by other properties in the area, such as its shape, topography, subsurface conditions, environmental factors, historical significance, access or non-access to navigable waters, practical restrictions imposed by abutting properties (such as obstructions) or other similar restrictions.  A property that is similar or identical to other properties in the area is not unique simply because the owner of the property did not build a house on the property at the same time that owners of nearby similar properties built houses on their properties when a prior zoning classification allowed such construction.  In other words, a property does not satisfy the uniqueness condition for a variance simply as a result of rezoning of an area.

**Land Use – Zoning and Planning – Variances**.  Under Baltimore County's variance regulations, the property owner seeking a variance must prove, among other things, that the proposed variance would be in harmony with the spirit and intent of other applicable zoning regulations that apply to the property.  A zoning agency's grant of a variance is reversible error when the applicant has failed to introduce evidence from which the zoning agency could reach that finding.  The inquiry focuses on harmony with existing regulations, not on harmony with regulations in effect at an earlier time.

**Land Use – Zoning and Planning – Variances**.  In Baltimore County, the Board of Appeals does not have the authority to grant a variance from height or area zoning regulations that would increase residential density.  Mechanisms for doing that include rezoning through the change/mistake rule or the quadrennial rezoning process.

**Land Use – Zoning and Planning – Variances**.  Whether or not neighbors who oppose a property owner's application for a variance have objected to variance applications for other properties in the neighborhood is not relevant to the question of whether the zoning agency should grant the application before it.

**Land Use – Zoning and Planning – Takings**.  In order to assert that a zoning classification has effected an inverse condemnation of a property – a "taking" that entitles the owner to just compensation – the claimant must exhaust the available remedies under the local land use law, including, as appropriate, applications for rezoning and applications for variances.

Circuit Court for Baltimore County
Case No. C-03-CV-22-000574

<u>REPORTED</u>

<u>IN THE APPELLATE COURT</u>

<u>OF MARYLAND</u>

No. 2094

September Term, 2022

---

JULIA AND RYAN KING, ET AL.

v.

CORNELIUS DAVID HELFRICH, ET AL.

---

Arthur
Shaw
McDonald, Robert N.
    (Senior Judge, Specially Assigned),

JJ.

---

Opinion by McDonald, J.

---

Filed: August 30, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The Maryland Legislature has adopted a policy that the orderly development and use of land requires comprehensive regulation through planning and zoning measures implemented by local governments. To carry out that policy, a local government adopts a comprehensive plan that sets broad goals on topics such as transportation, infrastructure, public facilities, and resource conservation. To implement the comprehensive plan, the local government then adopts a zoning ordinance that maps large areas of the jurisdiction into various zones and sets the types and intensity of uses that may be permitted in each zone. Although the comprehensive zoning adopted by a local government is presumed to be correct, a jurisdiction may include in its zoning laws mechanisms for exempting an individual parcel of land from a zoning classification or from particular regulations applicable to the classification. One such mechanism is a variance from the zoning regulations applicable to the parcel; another is piecemeal rezoning.

This case concerns an application for a variance from zoning regulations. A variance may be granted when a property is "unique" and, if so, when that uniqueness results in undue hardship or "practical difficulty" to the owner and when certain other criteria are satisfied.

Appellee Cornelius D. Helfrich owns 16 Locust Drive, ("16 Locust"), which is located in an area of Catonsville in Baltimore County. He has contracted to sell it to Appellee Dominion Properties, LLC ("Dominion"). 16 Locust is a long-vacant lot in a

residential subdivision[1] otherwise developed with houses prior to the adoption of the current zoning. That zoning has remained unchanged since 1996, when the County first adopted it through its comprehensive zoning process. As currently zoned, 16 Locust is too small to accommodate a house.

This case began when Mr. Helfrich and Dominion (collectively, "Applicants") sought variances from the area and setback regulations that apply to the zone in which 16 Locust is located and that currently constrain the construction of a house there. Appellants Julia and Ryan King and more than 50 other neighborhood residents (collectively, "Protestants") opposed the application.[2]

The County Board of Appeals ("Board") granted the variances on the basis that (1) 16 Locust, although not physically unique compared to other properties in the zone, was rendered "unique" by virtue of the adoption of the 1996 zoning and (2) there was undue hardship/practical difficulty because there was no other beneficial use of the property and a failure to grant the variances would result in an unconstitutional taking of Mr. Helfrich's property. Protestants have sought judicial review of that decision.

For the reasons explained below, we hold:

---

[1] 16 Locust was recorded on the subdivision plat as lot "6," in section "A." The parties refer to it in various ways. We refer to it, and to lot "7," which is the adjacent parcel at 18 Locust Drive, by street address.

[2] The caption of this case, both in the Circuit Court and this Court, has appeared in various different iterations, some of which did not include the Applicants, who are the Appellees in this appeal. We have adopted a version that identifies the Protestants as Appellants and the Applicants as Appellees.

(1) The Board did not apply the correct standard of *uniqueness* of a property for purposes of the variance regulation.

(2) Given the facts that the Board found, the property in question does not satisfy the correct standard of uniqueness.

(3) The Board failed to find, and Applicants failed to prove, that the proposed variances were in "strict harmony with the spirit and intent" of the existing zoning regulations applicable to 16 Locust.

(4) The County laws from which the Board derives its power to grant variances do not authorize the Board to exempt this particular property either from the uniqueness standard on the grounds that the variances are necessary to avoid a taking or from the other conditions that the regulation sets on the Board's variance powers.  Where, as here, a property owner maintains that the property was zoned erroneously and seeks to restore to the property the incidents of its former zoning, the owner's remedy is to seek a zoning reclassification from the County Council under the procedures for such requests. Applicants did not establish for purposes of their takings claim that they had sought that remedy.

(5) The Board erred legally to the extent that it based its decision on the evidence that variances had been granted in the past to owners of improved lots in the neighborhood.

# I

## Legal Background

The variance application is subject to the State laws applicable to the planning and zoning powers of a charter county such as Baltimore County, to the Baltimore County Code and Zoning Regulations, and to the case law on the role of variances in land use regulation.

Resolution of this appeal requires a review of the Board's interpretation of the County's variance regulation, both as to the uniqueness test set by that regulation and as to the Board's own role in granting a variance to avoid a taking. Because that regulation and its application to this case are best understood in light of the broader statutory scheme, we begin with a general overview of that scheme.

### A.   *Zoning Powers of a Charter County under the Maryland Code*

The Local Government Article of the Maryland Code empowers a charter county such as Baltimore County to "enact local laws relating to zoning and planning to protect and promote public safety, health, morals, and welfare[.]"   Maryland Code, Local Government Article ("LG"), §10-324(a). It further declares as a "policy of the State" that "the orderly development and use of land and structures requires comprehensive regulation through the implementation of planning and zoning controls" and that those controls "shall be implemented by local government."  LG §10-324(b)(1),(2).

With regard to planning controls, a charter county must enact and execute a "comprehensive plan" that implements various broad quality of life issues and includes certain visions and elements, such as development regulations and water and transportation infrastructure.  Maryland Code, Land Use Article ("LU"), §§1-401(b), 1-405, 1-406

through 1-411; *see also Friends of Frederick Cnty. v. Town of New Market*, 224 Md. App. 185, 194-98 (2015) (describing the visions and elements requirements). The charter county must then implement its comprehensive plan by adopting zoning laws and other land use measures that are consistent with the visions and certain of the elements stated in it. LU §1-417.[3] Among other things, the charter county adopts, and then periodically revises, a comprehensive zoning map.

As explained by the then-Court of Appeals (now known as the Supreme Court of Maryland), comprehensive zoning "involve[s] large geographic areas and emanate[s] largely from policy considerations, including future public needs, potential for orderly growth, and the public health, safety, and general welfare to be advanced." *County Council of Prince George's County v. Zimmer Dev. Co*., 444 Md. 490, 508 (2015); *see also Mayor & Council of Rockville v. Rylyns Enterprises, Inc*., 372 Md. 514, 535 (2002) (explaining comprehensive zoning). Comprehensive zoning adopted by a local legislative body is accorded "a strong presumption of correctness and validity." *Rylyns*, 372 Md. at 538; *see also People's Couns. for Baltimore Cnty. v. Beachwood I Ltd. P'ship*, 107 Md. App. 627, 638-41 (1995) (explaining the presumption of correctness to be accorded to the Baltimore County Council's reduction of the permissible density in an area through the comprehensive rezoning process).

---

[3] *See* Joseph A. Stevens, "Quiet Revolution" - Maryland Slowly Takes Back Local Government Land Use Controls, Md. B.J., November/December 2018, at 28, 32 (discussing various State mandates regarding local land use planning; noting that amendments to the Land Use Article in 2009 "memorialized the consistency mandate between comprehensive plans and implementing land use regulations.").

While setting the policy that land use be regulated on a comprehensive basis, the law recognizes that the circumstances of a particular property may justify excepting it from the restrictions of the otherwise applicable zoning. One mechanism for doing that is to rezone the property on a piecemeal basis through the county's "change/mistake rule" procedures. Those procedures, as described further below, apply when the property owner can prove that unforeseen changes have occurred in the surrounding neighborhood since the prior comprehensive rezoning or that the zoning authority made a mistake of fact in the comprehensive rezoning. *Zimmer*, 444 Md. at 512.

Another mechanism is to grant a property owner's application for a variance that exempts the property from one or more of the regulations applicable to the zone. That mechanism requires the property owner to establish that the property is unique in such a way that the regulation creates an undue hardship or practical difficulty for the owner. *See, e.g., Rylyns*, 372 Md. at 536-37 (describing mechanisms for excluding a particular property from comprehensive zoning).

To avoid the abuse of such mechanisms, the requirements for each must be specified as a part of the comprehensive zoning ordinance, not devised on a case-by-case basis. *Rylyns*, 372 Md. at 537-39. Thus, the default principle is that zoning is to be done comprehensively, in coordination with the inter-disciplinary planning process, rather than by piecemeal actions. *See* LU §§1-401(b), 1-405, 1-406 through 1-411, 1-417; *see also generally Rylyns*, 372 Md. at 535-38 (listing the characteristics of "proper" comprehensive zoning); *Zimmer*, 444 Md. at 505-08 (same); *Town of Bel Air v. Bodt*, No. SCM-REG-027-2023, slip op. at 2 n.2 (July 9, 2024).

A charter county may establish a board of appeals with original jurisdiction to review an administrative decision concerning, among other things, "an application for a zoning variation or exception or amendment of a zoning map." LG §10-305(b)(1). Within the limits set by the statute, the authority that a charter county chooses to confer on its board of appeals can vary by county.

**B.      *Zoning under the Baltimore County Code and Zoning Regulations***

1.      Zoning through the Quadrennial Comprehensive Zoning Process

Baltimore County reviews its comprehensive zoning map on a four-year cycle. Baltimore County Code (2015) ("County Code") §32-3-212. As part of that process, the County Council adopts a map that divides the county into zones, districts, or divisions by type of use. County Code, §§32-3-201, 202.[4]

The County Council has adopted regulations – the Baltimore County Zoning Regulations ("BCZR") – that elaborate on and implement the comprehensive plan and map.

---

[4] Baltimore County explains its comprehensive zoning process this way:

> The Comprehensive Zoning Map Process (CZMP) takes place every four years on an exact schedule specified in the County Code. Any citizen may request a zoning change on any property in the County. The CZMP covers a period of approximately 12 months and results in zoning decisions that are reflected in a final Log of Issues, with the County Council enacting legislation for each issue whether to retain the existing zoning or to enact a different zone(s) or district(s). Generally, each issue is a single property, but an issue may cover many adjoining properties and might even cover many hundreds of acres. The zoning on all properties which were not issues is re-enacted without change.

https://www.baltimorecountymd.gov/departments/planning/comprehensive-rezoning/index.html

Some regulations for the residential zones directly address density, which refers to the number of dwelling units allowable within a quantified space.[5] Others, often referred to as area regulations, address matters that have a more indirect impact on density, such as lot size requirements, minimum setback requirements, and front yard requirements.[6]

Article 1B of the BCZR governs zones classified as Density Residential ("D.R.") zones. In particular, BCZR §1B02.2 contains the density regulations applicable to land in the zones relevant to this case. Under that regulation, density of land in a residential subdivision is gauged by the total residential acreage of the subdivision, not lot-by-lot. For land zoned D.R. 2, as 16 Locust has been zoned since 1996, the regulation caps the maximum gross residential density at two dwelling units per acre of the subdivision. For land zoned D.R. 5.5, as 16 Locust was zoned prior to 1996, the regulation caps the maximum gross residential density at 5.5 dwelling units per acre.

Pertinent to the application that resulted in this case, BCZR §1B02.3 contains certain area regulations applicable to an existing subdivision in the D.R. zones. Under the area regulation for land zoned D.R. 2, the minimum net lot area for a dwelling is 20,000

_____

[5] For example, the Court in *People's Couns. for Baltimore Cnty. v. Beachwood I Ltd. P'ship* addressed a comprehensive rezoning in which the County Council "changed the zoning on the subject property from D.R. 5.5 to D.R. 1, thereby lowering the permitted residential density to 1 dwelling unit per acre." 107 Md. App. 627, 634 (1995).

[6] *See* BCZR §1B00.1 (in its declaration of findings regarding the regulations for the Density-Residential zones, referring to the "minimum standards for individual lots" as "having been derived from maximum overall density standards"); *see also, e.g.,* 3 Rathkopf's The Law of Zoning and Planning §51:8 (4th ed.) (explaining that development density can be regulated by various methods, including "setback and frontage requirements, limitations on bulk and building area, and lot depth," as well as through unit density and minimum lot size).

square-feet – slightly less than one-half acre. BCZR §1B02.3C. The lot must be at least 100 feet wide, the front yard must be at least 40 feet deep, the rear yard must be at least 40 feet deep, and the sum of the widths of the side yards must total at least 40 feet, with each side yard at least 15 feet in width. *Id.* Those are the regulations from which Applicants sought a variance.

During the quadrennial cycle, any person may seek the rezoning of a parcel by filing the appropriate form to generate an "issue" for the County Council's consideration during its eventual consideration of the comprehensive plan. County Code §32-3-211- 214; *see also People's Counsel for Baltimore County v. Prosser Co.*, 119 Md. App. 150, 168–69 (1998) (explaining the process for requesting a rezoning during the comprehensive plan cycle); footnote 4 above.

2. Rezoning Outside of the Quadrennial Planning Process

In the interim between quadrennial planning cycles, a person may seek to rezone a parcel by filing with the Board of Appeals a petition under the "change/mistake" rule. Such a petition must show either that the character of the neighborhood of a particular parcel has substantially changed since the last comprehensive rezoning or that the most recent classification of that parcel was erroneous. County Code, §§32-3-233, 32-3-503, 32-3-510; *see also Prosser*, 119 Md. App. at 168–69 (explaining the process for requesting a rezoning under the change/mistake rule).[7]

---

[7] The Baltimore County Department of Planning describes "two major differences" between quadrennial rezoning and change/mistake rezoning:

## C.     *Relevant Baltimore County Variance Laws and the Board's Authority*

### 1.     Baltimore County's Variance Laws

The Baltimore County Code authorizes the grant of a variance from certain regulations in accordance with the conditions set forth in the BCZR. County Code, §32-3-301. Those conditions are delineated in BCZR §307.1 which, in relevant part, provides:

> Authority to grant variances; procedures and restrictions.
>
> The Zoning Commissioner of Baltimore County[8] and the County Board of Appeals, upon appeal, shall have and they are hereby given the power to grant variances from height and area regulations, from off-street parking regulations, and from sign regulations only in cases where special circumstances or conditions exist that are peculiar to the land or structure which is the subject of the variance request and where strict compliance with the [BCZR] would result in practical difficulty or unreasonable hardship.
>
> No increase in residential density beyond that otherwise allowable by the [BCZR] shall be permitted as a result of any such grant of a variance from height or area regulations.

---

The County Council has broad legislative authority to place whatever zone it deems to be appropriate on a particular property. The Board of Appeals, however, is exercising delegated authority and is much more limited in the scope of its decision-making discretion. The Board of Appeals cannot grant a change in zoning unless the record shows that there has been either a substantial change in the character of the neighborhood since the last comprehensive process, or an error in the mapping. As a legal matter, either of these conditions is usually very difficult to prove.

https://www.baltimorecountymd.gov/departments/planning/comprehensive-rezoning/index.html.

[8] The reference to "the Zoning Commissioner" denotes the County "Office of Administrative Hearings." County Code §3-12-104(b) (providing that "[a]ny reference to the Zoning Commissioner, the Deputy Zoning Commissioner or the Hearing Officer in the Charter, the Code or the Baltimore County Zoning Regulations shall be deemed to be a reference to the Office [of Administrative Hearings]").

Furthermore, any such variance shall be granted only if in strict harmony with the spirit and intent of said height, area, off-street parking or sign regulations, and only in such manner as to grant relief without injury to public health, safety and general welfare.

They shall have no power to grant any other variances. . . .

BCZR §307.1 (breaks added between sentences for readability).

Broken down into its separate parts, this regulation imposes the following six conditions on the authority of the Zoning Commissioner or, as applicable, the Board of Appeals (collectively "zoning agency") to grant a variance:

(1)     The zoning agency may grant a variance only from certain specified regulations – those governing height and area, off-street parking, and signs.

(2)      The zoning agency may grant a variance "only in cases where special circumstances or conditions exist that are peculiar to the land or structure which is the subject of the variance request."  This condition is generally known as the "uniqueness" condition.[9]

(3)     The zoning agency may grant a variance "only in cases where ... strict compliance with the [BCZR] would result in practical difficulty or unreasonable hardship."  We shall refer to this condition as the "difficulty/hardship" condition.

---

[9] Similar variance provisions in the zoning laws of some counties refer to characteristics "unique" to the property.  Some, like the Baltimore County regulation, refer to  characteristics that are "peculiar" to the property.  Maryland courts have viewed the terms as interchangeable and generally refer to the application of this condition as the "uniqueness analysis."  *See Dan's Mountain Wind Force, LLC v. Allegany County Bd. of Zoning Appeals*, 236 Md. App. 483, 494-95 (2018).

(4)     "No increase in residential density beyond that otherwise allowable by the [BCZR] shall be permitted as a result of any such grant of a variance from height or area regulations."  We shall refer to this as the "density" condition.

(5)     "[A]ny such variance shall be granted only if in strict harmony with the spirit and intent of said height, area, off-street parking or sign regulations."  We shall refer to this as the "harmony" condition.

(6)     "[A]ny such variance shall be granted only … in such manner as to grant relief without injury to public health, safety and general welfare."  We shall refer to this as the "general welfare" condition.

*See* BCZR §307.1.  Further, the Zoning Commissioner and the Board of Appeals, when it has jurisdiction, "shall have no power to grant any other variances."  The word "shall," as used in the BCZR, "is mandatory."  BCZR §101.1.

The provision that prohibits the Board of Appeals from granting a variance that increases density has been part of the zoning law in Baltimore County since at least 1964. That year, Baltimore County amended its variance law to expressly prohibit the Board of Appeals from granting a variance that would increase residential density beyond that permitted by the regulations.  *See Yorkdale Corp. v. Powell*, 237 Md. 121, 124 (1964) (detailing the history of the legislation that amended the regulation).[10]

---

[10] At least one other home rule county has made a different decision, choosing to confer on its board of appeals the authority to grant a variance from density requirements. *See, e.g.*, *Dan's Mountain*, 236 Md. App. at 491 (quoting Allegany County's definition of "variance" as a "'change of density, bulk[,] or area requirements'").

- 12 -

2. Defining Uniqueness

The Maryland appellate courts have construed various counties' variance laws, including Baltimore County's, to require a sequenced analysis in which the threshold question is whether the property meets a threshold test of uniqueness. *Trinity Assembly of God of Baltimore City, Inc. v. People's Counsel for Baltimore Cnty.*, 407 Md. 53, 80-83 (2008) (citing *Cromwell v. Ward*, 102 Md. App. 691, 694-95 (1995)). To satisfy this test, an applicant must prove that the property "is – in and of itself – unique and unusual in a manner different from the nature of surrounding properties such that the uniqueness and peculiarity of the subject property causes the zoning provision to impact disproportionately upon that property." *Cromwell,* 102 Md. App. at 694. More specifically, the subject property must have "an inherent characteristic not shared by other properties in the area, *i.e.*, its shape, topography, subsurface condition, environmental factors, historical significance, access or non-access to navigable waters, practical restrictions imposed by abutting properties (such as obstructions) or other similar restrictions." *North v. St. Mary's County*, 99 Md. App. 502, 514 (1994).

The uniqueness condition "does not refer to the extent of improvements upon the property, or upon neighboring property." *North,* 99 Md. App. at 514 (applying a county critical area ordinance that, like Baltimore County's variance law, phrased the uniqueness test to require that "special conditions or circumstances exist that are peculiar to the land"); *see also Chester Haven Beach P'shp v. Board of Appeals*, 103 Md. App. 324, 335, n.3 ("the existence *vel non* of houses … is not normally relevant to variances; uniqueness of a property is relevant to variances."); *cf. Umerley v. People's Couns. for Baltimore Cnty.*,

108 Md. App. 497, 508 (1996) (the fact that the applicants had used the property for a trucking facility before the County adopted the area regulations at issue did not make the property unique for purposes of a variance). In sum, "[w]here a property's physical peculiarities do not cause the landowner to suffer disproportionately due to application of the zoning enactment in question, the property is not 'unique' in the law of variances." *Trinity Assembly*, 407 Md. at 82.

As this Court has explained, the uniqueness condition serves in part to ensure that a county's planning agencies do not intrude on the legislative powers reserved to its legislative body by routinely granting piecemeal exceptions for land that is no different from the other land governed by the particular regulation. *See Dan's Mountain*, 236 Md. App. at 494-95. The uniqueness condition thus implements the general land use principle that zoning is to be done on a comprehensive basis, rather than by piecemeal actions. *See, e.g., North*, 99 Md. App. at 518 (stating that exceptions such as variances are to be granted "sparingly, and under special circumstances" because "[t]o do otherwise would decimate zonal restrictions and eventually destroy all zoning regulations") (citation and internal quotation marks omitted). Accordingly, "[a] property that is affected uniquely may be entitled to relief through a variance, while a property owner experiencing a more common problem must seek a legislative remedy." *Dan's Mountain*, 236 Md. App. at 495.

3. When and How Practical Difficulty or Unreasonable Hardship Applies

Absent a threshold finding that the property is unique, "the process stops here and the variance is denied without any consideration of practical difficulty or unreasonable hardship." *Cromwell*, 102 Md. App. at 694-95. Thus, it is not appropriate to consider the

- 14 -

question of hardship first and, if some hardship exists, use that as a basis to find that the property is uniquely impacted by the zoning regulation. Instead, the first step is to focus on whether the property has an "inherent characteristic not shared by other properties in the area." *North*, 99 Md. App. at 515; s*ee also Umerley*, 108 Md. App. at 507 (reversing the Baltimore County Board's grant of a variance because the board "ignore[d] the first prong of the variance test"); *Cromwell*, 102 Md. App. at 726 (holding that the Baltimore County Board's grant of a variance was "arbitrary and illegal" because the applicant had not introduced evidence to establish the uniqueness element); *cf. Trinity*, 407 Md. at 83 (noting that because the Baltimore County Board had found that "the physical attributes of the Property are not distinguishing, . . . [t]here was no need for the Board to go further to consider whether physical uniqueness (which it found does not exist) causes the [regulation] to affect Trinity disproportionately.").

If the uniqueness condition is satisfied, the next step in the sequence is to determine whether the particular uniqueness has caused practical difficulty or unreasonable hardship. *Cromwell*, 102 Md. App. at 721. An applicant who seeks a variance from a restriction on the type of use permissible on the site must prove that the use restriction imposes an unreasonable hardship, while an applicant who seeks relief from area requirements, such as minimum setbacks, need only prove that compliance with the standards presents a "practical difficulty." *Dan's Mountain*, 236 Md. App. at 501-02; *Red Roof Inns, Inc. v. People's Counsel for Baltimore Cnty.*, 96 Md. App. 219, 225 (1993).

The hardship/difficulty standards do not require the applicant to prove that the application of the land use law in question effects a taking of the landowner's property

- 15 -

without compensation, in violation of the Fifth Amendment of the United States Constitution proscription against a governmental taking of private property for public use without just compensation.[11] *See Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 282 (1999). Nonetheless, the variance process may serve as an "relief valve" to avoid a takings claim. *Maryland Reclamation Associates v. Harford Cnty.*, 468 Md. 339, 401 (2020). Thus*,* at this second step in the analysis, the decision-making agency may consider proof of a taking as grounds for granting a variance. Alternatively, "there may be instances in which, when faced with a takings claim, a local jurisdiction reasonably determines that a particular land use creates such a conflict with adjacent uses or other legitimate land planning objectives, that it does not want to permit a land use through the application of a variance at that particular location." *Id.* at 416.

4. Relevance of Other Variances Granted in the Zone

The fact that a variance has previously been granted elsewhere in the zone is not necessarily relevant to either the uniqueness or the hardship/difficulty analysis. The

---

[11] The Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides that the government may not take private property "for public use, without just compensation." United States Constitution, Fifth Amendment. Article III, §40 of the Maryland Constitution prohibits the General Assembly from enacting a "[l]aw authorizing private property to be taken for public use without just compensation, as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation."

A taking can be possessory, as when the government exercises its eminent domain power to effect a physical taking of private property, or instead non-possessory, as when the government regulates a property in such a way and to such an extent as to effectively "take" it. *Maryland Reclamation Associates v. Harford Cnty.*, 468 Md. 339, 389 (2020). Only the second type is relevant here.

Supreme Court of Maryland has explained that such prior exceptions "are not in themselves controlling. Ill-advised or illegal variances do not furnish grounds for a repetition of the wrong. If that were not so, one variation would sustain if it did not compel others, and thus the general regulation eventually would be nullified. The annulment of zoning is a legislative function that is beyond the domain of the zoning board." *Easter v. Mayor & City Council of Baltimore*, 195 Md. 395, 400 (1950) (internal quotation marks and citation omitted). The application of the uniqueness and hardship conditions in a particular case thus does not depend either on whether, in another case, a landowner seeking a variance for different land had met those conditions or on whether other third parties have appeared to oppose those applications.

## II

## Factual and Procedural History

### A. *The Lot, its Ownership, and its Zoning*

As the record of the hearing before the Board of Appeals reveals, the basic facts concerning the lot in question and the history of the zoning related to it are undisputed.

16 Locust comprises 0.11 acres and is one of 20 lots in a residential subdivision in Catonsville. The developer of the subdivision platted and recorded it in the Baltimore County land records in 1933, before Baltimore County began to adopt zoning laws. Houses were built on all of the other lots in the subdivision, mostly during the 1930s and 1940s. In 1944, David and Bernadette Fields acquired both 16 Locust and an adjoining lot ("18 Locust"). At some point during that decade, a house was constructed on 18 Locust. In

1959, David and Bernadette Fields deeded 16 Locust to their daughter, Virginia Fields. Virginia Fields was Mr. Helfrich's aunt.[12]

In 1971, Baltimore County classified the zone containing 16 Locust as D.R. 5.5 – which permitted a density of 5.5 houses per acre. Under that classification, an owner of 16 Locust could have built a single-family house on that lot that complied with the density and area regulations applicable to it. No one did; nor does it appear from the record that anyone applied for a permit to build such a house.

In 1994, Virginia Fields died. The following year, Mr. Helfrich, as personal representative of her estate, took title to the property.

In 1996, Baltimore County adopted a comprehensive zoning map that rezoned nearly 500 acres in the Catonsville area,[13] including the subdivision where 16 Locust and 18 Locust are located, to reduce the density of new construction in the area. The new zoning classification, D.R. 2, permits only two houses per acre. The area regulations applicable to land in a D.R. 2 zone require a minimum lot size of 20,000 square feet to build a house. 16 Locust is far smaller than that. It is 50 feet wide by 100 feet deep and, not counting the area between the front sidewalk and the center of the street, comprises 5,000 square feet. Thus, 16 Locust is too small to accommodate a house consistent with the D.R. 2 classification.

---

[12] Our summary generalizes the ownership of the two lots by various members of the Fields family at various times.

[13] The record reflects a request to rezone 488 acres in Catonsville from D.R. 5.5 to D.R. 2 but does not specify the number of acres actually rezoned. In its opinion, the Board referred to a rezoning of "nearly 500 acres" and the parties have not disputed that reference.

BCZR §304.1 contains a grandfathering provision that relaxes certain area and width requirements for the construction of a dwelling on an undersized lot in a subdivision recorded before 1955, such as the one in which 16 Locust is located. However, the parties agree that §304.1 does not provide the relief necessary for the construction of a dwelling at 16 Locust.

In 2012, Mr. Helfrich, as executor of Virginia Fields' estate, transferred 16 Locust to himself personally, as a beneficiary of her estate. In 2014, the members of the Fields family who had inherited 18 Locust from David and Bernadette Fields sold it to Julia and Ryan King. Mr. Helfrich subsequently entered into a contract to sell 16 Locust to Dominion Properties, LLC.

Since 1996, the D.R. 2 zoning applicable to 16 Locust has remained in effect throughout the County's quadrennial adoptions of new comprehensive zoning maps. There is no suggestion in the record that any owner of 16 Locust has sought to have it rezoned, whether through the quadrennial comprehensive rezoning process or through a petition invoking the change/mistake rule.

## B.    *The Petition for Variances*

In September 2020, Dominion, as contract purchaser, and Mr. Helfrich, as owner, filed a petition for several variances for 16 Locust with the Baltimore County Department of Permits, Approvals, and Inspection. As amended a month later, the petition sought variances from the lot area, width, and side and rear yard setback regulations, all as set forth in BCZR 1B02.3.C.1. Specifically, Applicants sought a variance from the minimum lot area requirement of 20,000 square feet, to allow for a lot area they described as 5,820

- 19 -

square feet.[14]   They also sought variances to allow a lot width of 50 feet in lieu of the required minimum of 100 feet; to allow 10-foot side-yard setbacks totaling 20 feet in width, instead of the required minimum 15-foot side-yard setbacks totaling at least 40 feet; and a rear-yard setback of 25 feet, instead of the required minimum of 40 feet.

## C.     *The Variance Proceedings*

### 1.     Hearing and Decision by the County ALJ

A Baltimore County administrative law judge ("ALJ") conducted a virtual hearing concerning the variance petition and issued a written opinion that denied each of the four requested variances.   In his opinion, the ALJ described the testimony of Applicants' engineer to the effect that 16 Locust was "virtually identical" to the other lots in the subdivision but that it was "unique in a zoning sense" because it was the only vacant lot among them.   However, the ALJ concluded that Applicants had not met their threshold burden of proving that "the parcel itself is unique."   The ALJ further found that Applicants had not established a vested right to the pre-1996 zoning and had not established the elements of a taking.

### 2.     *De Novo* Hearing before the Board

Applicants appealed the ALJ's decision to the Board, which conducted a *de novo* hearing.   By then, the Applicants had dropped their request for a variance from the rear-yard setback requirement.

---

[14] The description of the property attached to the petition states that 16 Locust contains "a net area of 5,000 square feet."   The reference to 5,820 square feet, the "gross" lot area, included footage between the front sidewalk and the center of the street.

The Board conducted a virtual hearing on September 9, 2021. Applicants introduced the testimony of Patrick Richardson, a civil engineer, and Brian Leibowitz, a Dominion employee. Ms. King, appearing *pro se*, testified in opposition, as did three other residents of the neighborhood.

Mr. Richardson had been hired by Dominion to prepare site plans and file the variance petition. The Board accepted him as an expert in zoning and land use and as a civil engineer. He testified to his opinions on whether 16 Locust was unique for purposes of the variance ordinance and whether the current density and setback laws created a practical difficulty for the owner. Regarding uniqueness, he testified that the only distinguishing characteristic between 16 Locust and the others in the subdivision was that 16 Locust had remained vacant. In that regard, he testified that 16 Locust had no physical characteristics, such as steep slopes, wetlands, an irregular shape, or other environmental conditions, that would distinguish it from other lots in the subdivision. He testified that its dimensions are average for the lots in the subdivision.

Regarding the effect of the D.R. 2 zoning and setback regulations on the ability of Dominion to build a house at 16 Locust, Mr. Richardson testified that the maximum allowable size of a house would be 10 feet wide by 35 feet deep – a size that would not meet the County's regulations for the minimum size of a house. He testified that he did not know of any principal use for the lot other than a house. Noting that D.R. 2 is a residential zone, he "guess[ed] you could try to put a garden on it or something, but you couldn't develop anything," and could only put an accessory building on it if it were combined with an adjacent lot.

- 21 -

Mr. Richardson testified that 16 Locust was zoned D.R. 5.5 in 1971 and that the variances would not be necessary if it were still zoned D.R. 5.5. Asked by Applicants' counsel whether the rezoning of the area as D.R. 2 had made "these lots … pretty much unique," Mr. Richardson testified:

> Yeah, because these lots were never contemplated to be zoned D.R. 2. That's why in 1971 they rated them all as D.R. 5.5 because … there's thousands and thousands of lots throughout Baltimore County that are all fifty-foot-wide lots and they all got zoned into D.R. 5.5, which is the closest thing the County had to being a fifty-foot-wide lot. These lots should be zoned D.R 5.5, but the community out there chose to downzone them to make them all non-conforming uses.

Asked to address the "practical difficulty" posed by the area and setback regulations, Mr. Richardson testified, "Practical difficulty is that this, the zoning, this zoning is being imposed on this property. The D.R. 2 being imposed on a substandard property." He also stated that the D.R. 2 zoning created a practical difficulty because a house on the parcel at 16 Locust could not meet the setbacks applicable to D.R. 2-zoned land.

Mr. Leibowitz testified about the design and siting of the house that Dominion proposed to construct on the lot. His testimony focused on Dominion's efforts to conform the proposed house to the design of the existing houses on the block and to address neighbors' concerns.

In her testimony in opposition to the petition, Ms. King said that she and her husband had offered to buy 16 Locust from Mr. Helfrich, and introduced the formal offer that they had made to Mr. Helfrich's realtor. She also introduced photographs and a property map to support the proposition that 16 Locust is not physically different from the other lots in the subdivision. She testified that she sought a denial of the application "in order to

- 22 -

maintain the integrity of the zoning regulations and ensure that a precedent is not set for future new home construction in our D.R. 2 zone."

Laura Scherer, a resident of the neighborhood since 1956, also questioned the compliance of the proposed construction with the D.R. 2 zoning. Stating that she "assume[d] that the current zoning codes implemented by Baltimore County were put in place to protect its residents from over development," she observed that "two houses to an acre or forty thousand square feet" – the density requirement – "translates into twenty thousand square feet for one house," and that 16 Locust consisted of only five thousand square feet.

Barry Sanders, another neighbor, also testified in opposition to the petition. The Board Chair remarked to Mr. Sanders that it "seemed as though" many undersized lots had been granted zoning relief in the "larger area." The Chair questioned Mr. Sanders on whether he had objected to a past application by his next door neighbors for a variance to expand the house there. After Mr. Sanders said that he was not aware of the nature of such a variance, the Chair stated that "it troubles me legally that someone could legally create a lot and not be treated in exactly the same way as every, literally every other parcel on the street." Next, Applicants' counsel examined Mr. Sanders on whether he had objected to his neighbors' application. When Mr. Sanders objected on the grounds that "whether or not someone else got a variance" was not relevant to the variance for 16 Locust, the Chair overruled the objection. Mr. Sanders then testified that he did not recall objecting to his neighbors' application.

Another neighbor, Aaron Neal, testified that all of the other variances in the neighborhood had pertained to houses that had been built before 1996, and that none had been for the 75% reduction in the square footage requirement that Applicants were seeking.

3.      Deliberation and Written Opinion of the Board of Appeals

Two months later, on November 18, 2021, the Board deliberated on the application in open session, as required under the Open Meetings Act.  In the course of the Board's discussion, all three members agreed that 16 Locust did not meet the threshold uniqueness condition under the *Cromwell* standard.  However, the Chair and one other member felt that a variance should be granted on the ground that doing so was necessary in order to avoid a taking.  The Chair summarized the majority's decision on that point:

> Then, in summary, we are finding that the application of the zoning regs, without a variance, would be a regulatory taking that would deny all physical use of the property to the owner.  And accordingly, to avoid a takings claim, we will grant the variances as requested, over the objections of Mr. Evans [the Board's dissenting member], who believes that the offer by the adjoiner represents a reasonable economic use to the owner of property.

The Dissenting Member (Mr. Evans) clarified: "But the three of us do agree that no variance is justified under *Cromwell*."  The Chair responded, "Yes," and the third member of the Board responded, "Correct."

On January 12, 2022, the Board later issued a written majority opinion, accompanied by Mr. Evans' written dissent.  The majority opinion departed from the statements of those two members during their public deliberation of the matter.  In their written opinion, the two members of the Board majority not only stated that a variance was necessary to avoid a taking, but also stated that 16 Locust met the uniqueness requirement,

- 24 -

apparently by virtue of the fact that 16 Locust was the only vacant lot in the subdivision.

In doing so, the majority looked to a test that it purported to quote from this Court's opinion

in *Mueller v. People's Counsel for Baltimore County*, 177 Md. App. 43 (2007), a case that

involved D.R. 3.5 zoning. In its written opinion, the Board majority attributed the

following language to this Court:

> While it appears from *Cromwell* that there must be some physical uniqueness
> in the size and shape or environment of the property to qualify for a variance,
> we believe the court did not address the imposition of new zoning regulations
> on old subdivisions. In such cases, the imposition of new regulations impacts
> the lots in the old subdivision disproportionately as compared to lots in the
> area developed after and in accordance with new regulations. We therefore
> find that, under these circumstances, the property passes the first test and is
> unique. This subdivision was recorded in the 1940s prior to D.R. 3.5 zoning,
> and denying the requested variance would result in a hardship and practical
> difficulty. [italics omitted[15]]

Thus, according to the Board Majority, this Court in *Mueller* created and applied a new

species of uniqueness that applies to instances of downzoning.[16]

The Board then applied the purported *Mueller* test to 16 Locust: "Applying the

*Cromwell* analysis, it is clear that the property fails the showing of unique physical

characteristics different from surrounding properties. However, applying the *Mueller*

analysis, the Property passes the first test and the uniqueness prong is satisfied."

In fact, as Applicants have conceded, this Court did not adopt in *Mueller* what the

Board Majority referred to as the "*Mueller* analysis." Instead, in the passage from *Mueller*

---

[15] Part of the language in the quotation is italicized in the *Mueller* opinion; the Board majority italicized some of that language differently. The font change is immaterial here.

[16] As noted earlier, the transcript of the Board's deliberations at the open meeting does not reflect this reasoning.

relied upon by the Board Majority, this Court was simply quoting the *Board's* rationale in *Mueller* for finding the property in that case to be unique. 177 Md. App. at 62. There is no indication in this Court's decision in *Mueller* that it adopted the Board's rationale,[17] as the Court resolved that case on other grounds. In effect, the Board Majority was simply reiterating a rationale that it had given in a prior case, but that had not been approved or adopted by any court.

After finding that the uniqueness condition had been satisfied, the Board proceeded to the second step of the *Cromwell* standard – whether failure to grant a variance would cause practical difficulty or unreasonable hardship to the landowner. In that regard, the Board majority looked to whether, in the absence of a variance, the owner would be deprived of beneficial use of the property for a reasonable purpose. It found that the neighbors' offer to buy 16 Locust did not amount to a beneficial use of it. Observing that "[z]oning laws should not amount to a deprivation of an owner's ability to use its property for a permitted purpose" and that "an inverse condemnation . . . includes conduct that effectively forces an owner to sell," the Board Majority noted that "the alternative favored by the courts is the granting of a variance to permit the use of the property for a permitted

---

[17] If we were to look for clues as to whether the *Mueller* Court viewed the Board's test favorably, we would note that the *Mueller* Court also quoted at length from the Circuit Court's "well-written opinion," in which the Circuit Court had reasoned that considering undeveloped lots to be unique on that circumstance alone "would effectively gut the impact of the rezoning." *Id*. at 65. However, in the end, the Court did not address the uniqueness issue; it ruled instead on the basis of a different regulation. It thus neither approved nor adopted the Board's test.

purpose." The Board did not explicitly address whether the requested variances satisfied the harmony condition.

The Board majority then addressed various arguments raised by the Protestants and concluded:

> Importantly, no Protestant identified any principal use, other than the proposed residence, that is permitted on the lot. Protestants historically have not opposed prior variances granted on this street – through one such variance nearly doubled the size of one house and increased its impervious area. There was no allegation that the proposed house design, as modified, was not in keeping with the other houses in the subdivision.

Accordingly, the Board granted the requested variances.

The third member of the Board, Mr. Evans, filed a lengthy dissent in which, among other things, he disagreed with the Board both on the question of whether the effect of the 1996 rezoning rendered 16 Locust "unique" for purposes of the *Cromwell* test and whether a taking had occurred.

The Kings, joined by more than 50 neighbors, petitioned for judicial review in the Circuit Court for Baltimore County. The Circuit Court held a hearing in October 2022 and later issued a written opinion affirming the Board's decision.[18]

The Protestants then filed a timely notice of appeal to this Court.

---

[18] The Circuit Court summarized the arguments of the parties and the opinions issued by the Board of Appeals, but did not elaborate on its own reasoning in any detail. As noted in the text, our role is not to review that decision but rather to directly evaluate the decision of the Board.

**Discussion**

In their appeal, the Protestants assert that the Board erred legally in concluding (1) that the threshold conditions for granting the variances had been satisfied and (2) that the 1996 downzoning amounted to a "taking" of 16 Locust that justified the granting of variances more than two decades later.

*A.* *Standard of Review*

When an appellate court reviews the final decision of an administrative agency, such as the Board of Appeals, it looks through any lower court decisions and directly evaluates the agency's decision. *See, e.g., Assateague Coastal Tr., Inc. v. Schwalbach*, 448 Md. 112, 124 (2016); *People's Counsel for Balt. Cnty. v. Surina*, 400 Md. 662, 681 (2007). When evaluating an agency decision, a court examines (1) whether the record as a whole contains substantial evidence that supports the agency's findings and conclusions, and (2) whether the agency premised its decision on an erroneous conclusion of law. *Nat'l Waste Managers, Inc. v. Forks of the Patuxent Improvement Ass'n, Inc.*, 453 Md. 423, 441 (2017). In doing so, a court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency. *United Parcel Serv., Inc. v. People's Couns. for Baltimore Cnty.*, 336 Md. 569, 586 (1994).

An agency's interpretation of a statute that it administers presents a question of law on which the appellate courts "occasionally apply agency deference." *Comptroller of Maryland v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 360 (2022). Whether the agency correctly interpreted and applied applicable case law presents a legal question on

which the courts "do not apply any agency deference," as does the question of the agency's jurisdiction over the matter. *Id.*

**B.      *Whether the Application Satisfies the Elements Required for a Variance***

Protestants argue that the Board erred legally by (1) not applying the uniqueness prong of the variance test set forth in *Cromwell* and misapplying the "practical difficulty" prong; (2) failing to address the requirement that the requested variances be "in harmony" with the applicable area regulations, and (3) failing to make findings on the general welfare standards.

**1.      Whether the Board Applied the Wrong Test of "Uniqueness"**

Protestants argue that the Board erred by exempting the application from the uniqueness test that this Court articulated in *Cromwell*. The Board did so on the strength of its own view that "[u]niqueness is not limited to [a property's] physical characteristics" and that uniqueness can arise when "imposition of new zoning regulations on old subdivisions" impacts the lots in those subdivisions "disproportionately as compared to lots in the area developed after and in accordance with new regulations." Those circumstances, the Board decided, made 16 Locust, and presumably every undeveloped lot in a downzoned old subdivision, "unique" for purposes of the variance regulation.

In support of the proposition that uniqueness can arise from the imposition of new regulations on old subdivisions, the Board cited this Court's opinion in *Mueller* but, as noted earlier, apparently mistook a quotation of the Board opinion under review in the background section of the Court's opinion for a holding by the Court itself. As indicated earlier, this Court's decision in *Mueller* did not hold that a rezoning would satisfy the

- 29 -

uniqueness test. The Board cited no other authority for its view that a petitioner for a variance can meet the uniqueness test for an undeveloped lot that is not physically unique by showing that new regulations impact the lot more than they impact the developed lots.

The Board erred in several ways when it created and applied its own uniqueness test; its test has no basis in statute, regulation, or case law. The shortest route is that the Board's view of uniqueness – that the disproportionate effect of a regulation on a property can by itself meet the uniqueness prong – contradicts the controlling law. That law is as follows: "Where a property's physical peculiarities do not cause the landowner to suffer disproportionately due to application of the zoning enactment in question, the property is not 'unique' in the law of variances." *Trinity*, 407 Md. at 82. As explained in *Cromwell*, 102 Md. App. at 726, and *Umerley*, 108 Md. App. at 507, the Baltimore County Board of Appeals errs when it bypasses the threshold requirement that the property be physically unique. In this case, too, the Board erred when it bypassed the well-established interpretation of the uniqueness requirement in the case law.

Further, the Board exceeded its role when it adopted its own uniqueness test for a defined class of properties in the absence of any statutory authority for doing so. To protect the integrity of the comprehensive zoning process, mechanisms for excepting a property from comprehensive zoning must be specified as part of the zoning ordinance, not created on a case-by-case basis. *Rylyns*, 372 Md. at 537-38. For the same reason, boards of appeals are to exercise their variance power "sparingly" and "only under exceptional circumstances." *Cromwell*, 102 Md. App. at 703; *see also Dan's Mountain*, 236 Md. App. at 494-95. The Baltimore County Council has spelled out the variance mechanism in the

- 30 -

County's zoning ordinance and regulations. They contain no exemption from the uniqueness requirement for undeveloped lots in subdivisions recorded before the zoning change in question. The Council did enact certain grandfathering provisions for small lots in older subdivisions, but the parties agree that none apply here. Had the County Council wished to adopt an exemption like the one fashioned by the Board, it presumably would have done so, through either the variance or the grandfathering provisions. It did not do so and we infer that the absence of such a provision was intentional. *See, e.g.*, *Lyles Consumer USA Inc. v. Santander*, 478 Md. 588, 602-03 (2022) (inferring from the absence of certain language in a statute that the General Assembly intended to omit it).

In short, the Board's role in addressing variance appeals does not include legislating exemptions from the variance regulations. As the dissenting Board member in this case concisely stated: "To say that a zoning restriction is what generates *Cromwell* uniqueness is to define away uniqueness as a requirement."

2.      Whether the Correct Uniqueness Standard Was Met

When an administrative agency such as the Board applies the wrong legal standard, and "some evidence exists, however minimal, that could be considered appropriately under the correct standard," the court should remand the case to the agency for the agency's application of the correct standard. *Belvoir*, 355 Md. at 270. In this case, however, the Board considered the evidence under the *Cromwell* standard of uniqueness as well as under its own test. It concluded that the Applicants had not met the *Cromwell* standard. Specifically, the Board concluded that "[a]pplying the *Cromwell* analysis, it is clear that the property fails the showing of unique physical characteristics different from surrounding

- 31 -

properties." That conclusion is amply supported by the record in this case. In light of the Board's conclusion that 16 Locust does not meet the governing standard of uniqueness, we reverse, rather than remand, the Circuit Court judgment that affirmed the Board's grant of the variances.

The Board's conclusion that 16 Locust was not unique under *Cromwell* also answers the question of whether Applicants proved either practical difficulty or unreasonable hardship for purposes of the second prong. That is because the alleged difficulty or hardship must be caused by the particular uniqueness of the property. *See, e.g., Cromwell*, 102 Md. App. at 721. When the property does not satisfy the proper standard of uniqueness, there is no occasion to reach the second prong.

3. Whether the Board Applied the "Harmony" Condition Correctly

Protestants argue that the Board also erred legally when it granted the requested variances without addressing all of the conditions that BCZR §307.1 places on the Board's authority to grant a variance. Among those conditions is the requirement that a variance "shall be granted only if in strict harmony with the spirit and intent of said height, area, off-street parking or sign regulations." The Board did not explicitly address that condition, either in its opinion or in its oral deliberations. Thus, there is no agency interpretation of BCZR §307.1 that might qualify for "a degree" of deference under *Comptroller of Maryland v. FC-GEN*, 482 Md. at 361-62.

Possibly, the Board intended to refer to the harmony condition in stating that "[t]here was no allegation that the proposed house design, as modified, was not in keeping

- 32 -

with the character of other homes in the subdivision."[19]  However, that statement does not constitute a determination that Applicants met their burden of proving the harmony condition; it merely describes a lack of an allegation by members of the public – a circumstance irrelevant to whether Applicants met their burden to prove that the condition had been met.  *See, e.g., Mueller*, 177 Md. App. at 70 ("The burden is on the applicant to show facts to warrant a variance"); *Angelini v. Harford Cnty.*, 144 Md. App. 369, 377 (2002) ("Generally speaking, property owners are not entitled to zoning changes automatically just because nobody opposes them.").  The Board erred legally by not reaching a determination on a condition for granting a variance.

The next question is whether the record contains evidence, "however minimal," for the Board to address the harmony condition under the correct standard.  *Belvoir Farms*, 355 Md. at 270.  That standard, as unambiguously stated in BCZR §307.1, requires the Board to find that the requested variances would be "in strict harmony with the spirit and intent of said height, area, off-street parking or sign regulations."  The "said" regulations are those from which the Applicants seek variances – here, the area regulations for the D.R. 2 zone.

At the hearing, Applicants introduced their expert's opinion that the style of the house that Dominion proposed to build would be consistent with that of the existing houses

---

[19] In that section of its majority opinion, the Board also stated: "Protestants historically have not opposed prior variances granted on this street – though one such variance nearly doubled the size of one house and increased its impervious area."  The relevance of that finding to whether Applicants had proven the conditions needed for a variance is doubtful at best.  See Part I.C.4 of this opinion above.

in the subdivision and that the siting would be compatible with that of those houses. Summarizing his opinion, he stated, "it'll be pretty much in … harmony and similar size and scope of what all the rest of the houses are here, on the street."  However, that is not the test stated in the County's variance law, which instead requires harmony with the regulations from which an applicant seeks relief.  As to those, Applicants' sole evidence was their expert's opinion that the D.R. 2 designation for the subdivision was a mistake and that the proposed dwelling would have complied with the D.R. 5.5 regulations.

For their part, Protestants asserted that variances of the magnitude sought by Applicants would not comport with the D.R. 2 regulations.  Their testimony related to the standard in the regulation.  Had Applicants introduced any evidence, however minimal, on the regulatory standard, this Court would remand the issue for the Board's application of it to Protestants' testimony and to the undisputed facts on the lot size and proposed house; that task would lie within the Board's function, not ours.  Here, however, the position that Applicants took was that the D.R. 2 regulations were wrong for land in the subdivision, not that the proposed construction would be in harmony with the spirit and intent of the D.R. 2 regulations.  Consistently with that position, Applicants did not introduce evidence, however minimal, of harmony with the current regulations.

We reverse the grant of the variances for lack of proof of the harmony condition. This basis of reversal is independent of our holding that the application fails because of the undisputed facts that 16 Locust is not unique.[20]

_____

[20] In light of this holding, we do not reach Protestants' argument that the Board failed to address the "general welfare" condition on its authority to grant a variance.

### 4.       Variances and Density

For purposes of guidance, we note that the Board may not grant a variance that increases a density limit[21] imposed by a zoning classification.[22] BCZR §307.1. The Board may grant a zoning re-classification that changes density under the change/mistake rule, or else the County Council may do so during the quadrennial comprehensive rezoning process. Here, the Board effectively changed the zoning classification of 16 Locust back to D.R. 5.5 by granting area variances that seemingly would result in a density permitted under the D.R. 5.5 classification, but not the D.R. 2 classification.

Generally, a board of appeals may not grant a variance to do that which another law precludes it from doing. *Kenyon v. Bd. of Zoning Appeals of Harford Cnty.*, 235 Md. 388, 394 (1964) ("The various powers of the Board enumerated in the ordinance must be read together, and we do not think the Board could do under the variance provision what it manifestly could not do under the non-conforming use section…."); *see also, e.g.*, 101A C.J.S. Zoning and Land Planning §320 ("In particular, under the guise of a variance, the

---

[21] As noted above, the density requirement is gauged by the average of the land in the subdivision. BCZR §1B02.2. In this case, Applicants described the subdivision as fully developed under the former D.R. 5.5 classification, with the sole exception of 16 Locust. Assuming that is correct, the grant of a variance from the area regulations in BCZR §1B02.3.C.1 would likely increase the density of the subdivision under the current D.R. 2 classification.

[22] Neither party addressed this issue. We do so because the Board may have overlooked the express limitation in the regulation on the Board's authority to grant variances that change the allowed density related to a property.

zoning board may not waive, suspend, disregard, or ignore the zoning regulations, depart from them, set them aside, or nullify them.").[23]

## C. *Whether a Potential Takings Claim Required the Granting of the Variances*

In granting the requested variances to forestall a takings claim against the County, the Board implicitly assumed both that such a takings claim would be meritorious should the Board deny the application and that it fell to the Board to avoid such a claim. To the same effect, Applicants argue in this Court that because the BCZR grandfathering provision does not provide all of the relief needed to construct a house on 16 Locust, "the use of variances remains the sole remedy to the difficulty in compliance with the zoning requirements."

Neither the Board's assumption nor Applicants' argument accounts for the role of variances in the County's land use scheme. Under that scheme, as explained in Part I of this opinion, the variance procedure is not the sole route by which a property owner may seek relief from regulations applicable to the zone in which the property is located. Moreover, in this case, the variance procedure is not necessarily even a sufficient route, given the County Code's express prohibition on increasing density through a variance.

To bring a takings claim, a plaintiff must exhaust its available administrative remedies. *Maryland Reclamation*, 468 Md. at 359-61. The exhaustion issue is a jurisdictional question that a court may bring up *sua sponte*. *Id*. at 387. A board that

---

[23] Here, Applicants' remedy for a zoning classification that they deemed to be wrong for lots like Lot 16 would be the procedures that the County provides for rezoning requests. For example, as noted by the Kings in their closing memorandum to the Board, the owner of 16 Locust could have sought to exclude it from the 1996 rezoning.

considers whether to grant a variance on grounds that a taking would otherwise result should evaluate that same issue.

In this case, Applicants' expert made clear that the real problem was the County's classification of the small lots of the subdivision and other areas as part of a D.R. 2 zone.[24] To address such a problem, a landowner may seek a zoning reclassification under the County's rezoning procedures for such requests. The record contains no evidence that Applicants pursued those routes, whether under the change/mistake rule or during the six previous quadrennial comprehensive plan processes subsequent to 1996.

Relatedly, to prove a takings claim, a plaintiff must prove the element of causation – that is, that the governmental regulation at issue caused the taking. *See, e.g., Neifert v. Dep't of Env't*, 395 Md. 486, 517 (2006) ("Causation is a necessary element to establishing a valid takings claim.") Thus, a board that considers whether to grant a variance on takings grounds must consider whether the denial of the variance, by itself, would effect a taking. In this case, the Board erred by not considering whether Applicants had shown that attempts to have 16 Locust rezoned either had been unsuccessful or would be futile, by not examining whether the proposed variances were Applicants' only hurdle to constructing a house on 16 Locust or whether density regulations would also pose an obstacle, and by

---

[24] Consistently with that position, Applicants argue here that the "imposition of the D.R. 2 zone on this privately held piece of property" would work as an uncompensated dedication of the lot to open space. That argument, like their expert's testimony, challenges the County Council's legislative decisions concerning the zoning of the area during the County's comprehensive zoning process.

instead assuming that Applicants would be able to prove a taking if the Board did not grant a variance.

## IV

## Conclusion

The Baltimore County Board of Appeals erred when it concluded that it could grant the proposed variances without applying the test for uniqueness set forth in the controlling precedent. Because the Board itself concluded that the application did not meet that test, we direct the Circuit Court to reverse, rather than remand, the Board's decision.

In any event, the Board also erred legally by failing to reach a determination that the proposed variances were in harmony with the intent of the particular area regulations. Because the record does not contain evidence responsive to that condition to the grant of a variance, that error requires reversal of the grant of the variances. Further, the Board erred legally when it implicitly concluded that Applicants had both exhausted their remedies and proven causation for purposes of a takings claim.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE DECISION OF THE BOARD OF APPEALS. COSTS TO BE PAID BY APPELLEES.**